Opinion filed February 16, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-121 |
| ADOLFO E. PALOMERA, | ) ) ) | Honorable C. Robert Tobin III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Hudson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a bench trial, the defendant, Adolfo E. Palomera, was found guilty of aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2016)) and sentenced to 16 years' imprisonment. On appeal, the defendant argues that the admission of hearsay statements at trial violated his confrontation rights, the trial court erred in failing to conduct a preliminary inquiry into his *pro se* claims of ineffective assistance of counsel, and his sentence was excessive. We affirm.

¶ 2 I. BACKGROUND

¶ 3 On April 27, 2017, the defendant was indicted on one count of aggravated domestic battery (*id.*) and one count of domestic battery (*id.* § 3.2(a)). The charges were related to an incident that occurred on November 26, 2016, in which the defendant's girlfriend, Amity Picard, suffered

multiple bone fractures to her face. When he was arrested on these charges, the defendant was out on bond in two McHenry County cases.

¶ 4     Picard died on March 3, 2018, based on circumstances unrelated to the incident at issue in this case. Prior to trial and pursuant to section 115-10.2a of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.2a (West 2016)), on the basis that Picard was unavailable to testify at trial, the State filed a motion to admit hearsay statements that Picard made to a police officer, a neighbor, a paramedic, and a nurse.

¶ 5     In response to the State's motion, the defendant, represented by private counsel, argued that section 115-10.2a was not applicable because it did not apply when the declarant was unavailable due to death and that the admission of Picard's out of court statements violated his confrontation rights pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004).

¶ 6     Following a hearing, the trial court granted the State's motion. The trial court concluded that section 115-10.2a applied when a declarant was deceased and that the statements at issue were admissible under section 115-10.2a because the statements had circumstantial guarantees of trustworthiness. The trial court further found that the statements were admissible under *Crawford* because they were made in the course of an ongoing emergency and thus were not testimonial in nature.

¶ 7     On March 29, 2019, the defendant waived his right to a jury trial and signed a written waiver. Before accepting the waiver, the trial court questioned the defendant. In response to those questions, the defendant stated that he understood the difference between a bench trial and a jury trial and that he had discussed the two options with his attorney. The trial court asked the defendant twice whether anyone was forcing him to waive a jury trial. The defendant responded "No" and "Not at all."

¶ 8     The matter thus proceeded to a bench trial. At trial, Candace Picard testified that Picard was her daughter. On November 26, 2016, Picard was taken to the hospital. Candace identified People's exhibit No. 2 as a photograph of Picard from the hospital, showing that she was beaten and bruised. Candace identified People's exhibit No. 5 as a photograph of Picard after she had surgery to rebuild her orbital bone and repair her nose and cheekbone. Candace identified the defendant in court as the person with whom Picard was in a dating relationship at the time of the injuries in November 2016. She testified that the defendant was also the father of one of Picard's children.

¶ 9     Pamela Dietz testified that at 11 p.m. on November 26, 2016, she was at home at 234 Garden Drive, in Belvidere, when someone started pounding on her door. When she opened the door, a woman came running to the door. The woman's face was covered with blood. It was very cold out and the woman was wearing pajama pants and a tank top and was barefoot. The woman was acting scared and hysterical. Dietz identified People's exhibit No. 2 as a photograph of the woman who came to her door. The woman was screaming that her boyfriend beat her up, that he was after her, and that she was scared. The woman repeatedly stated that her boyfriend beat her up and that she thought he was looking for her. Dietz testified that she brought the woman into her home, locked the door, and called 911. On cross-examination, Dietz acknowledged that the woman never stated the name of her boyfriend who had beaten her.

¶ 10     Dr. Randall Rhodes, a radiologist, testified that he reviewed CT scans of Picard's injured facial bones. He testified that Picard sustained a nasal bone fracture and an orbital fracture to the bony part of her eye socket. Based on his medical training and experience, Rhodes opined that the injuries could have been caused by a strike to the face with a closed fist. On cross-examination, Rhodes acknowledged that the injuries could have been caused by a number of things and that he

could not tell from the images how the injuries were inflicted or whether they were accidental or intentional.

¶ 11 Officer Zachary Reese, a Belvidere patrol officer, testified that he was dispatched to Dietz's house at about 11:15 p.m. on November 26, 2016, in response to the report of a battery victim. When he arrived, he saw Picard standing in the middle of the street with no shoes on and her face was bloody and swollen. Her right eye was swollen shut and her lip and nose were bleeding. Over objection, Reese testified that he asked Picard what had happened and she told him that she got into an argument with her boyfriend and that he struck her. Picard said that the person who hit her was "Adolfo Palomera" and that the injuries were inflicted at 1222 Ruby Street. Reese testified that Picard was crying and emotional and it was difficult to understand what she was saying. Reese stayed with Picard until the paramedics arrived. He identified People's exhibit Nos. 2, 3, and 4 as photographs showing how Picard looked on the night at issue.

¶ 12 Reese testified that he went to 1222 Ruby Street but no one was there. When he returned with another officer several hours later, he observed the defendant exiting the front door. The defendant appeared intoxicated and had fresh scratches and marks on his knuckles. Reese and the other officer arrested the defendant.

¶ 13 On cross-examination, Reese acknowledged that Picard told him that she had been drinking alcohol that evening. He also acknowledged that he did not see the defendant inflict any injuries on Picard, he did not know what caused the marks on the defendant's hands, and he did not take pictures of the scratches and marks on the defendant's hands. The defendant told Reese that close associates call him "Vito." Reese acknowledged that Picard did not refer to her boyfriend as "Vito." Finally, Reese testified that 1222 Ruby Street was about a block and a half from where Picard was found.

¶ 14    Marci Ramsey, a paramedic, testified that she was dispatched to Dietz's address on November 26, 2016, at about 11:18 p.m. in response to a report of a battery victim. Upon arrival, Ramsey saw Picard as the police were escorting Picard toward the ambulance. Picard was disheveled and not wearing shoes. When Ramsey saw that Picard's face was bruised and not symmetrical, she ran toward Picard because she was worried that Picard had a head injury. At that moment, Ramsey heard a really loud male voice yelling. Picard became very frightened and acted as though she wanted to run. Picard stated, "He's going to kill me, he's going to kill me." Ramsey looked to where the voice was coming from but did not see anyone. Police officers ran toward where the voice was coming from.

¶ 15    Ramsey further testified that she had to coerce Picard to enter the ambulance. She told Picard that it was safe and that they could lock the doors. Once inside, Picard curled up into a fetal position and would not talk. Picard was upset, crying, and writhing around. After she gave Picard an ice pack to put on her face, Picard calmed down a bit. Ramsey testified that Picard had scratches and bruises all over her, including her feet. Picard also had pattern bruises on her arms, shoulders, and neck. Ramsey explained that pattern bruises are bruises in the pattern of something holding you that makes the marks, such as a hand or fingertips.

¶ 16    Ramsey testified that she asked Picard what happened. Picard told her that she was drinking and when she wanted to stop drinking, the person she was with held her prisoner. The person tried to make her drink more and, when she refused, started to beat her. Ramsay testified that, because she wanted to assess Picard's neck, she asked Picard if she had been pulled by her hair. Picard responded that her attacker pulled her to the ground by her hair and beat and punched her repeatedly. During the ambulance ride to the hospital, Picard continued to be very frightened. She repeatedly stated, "He's going to kill me," "I'm so scared," and "I'm going to get hurt." Ramsey

identified People's exhibit Nos. 2, 3, and 4 as photographs showing how Picard looked on the night at issue.

¶ 17    On cross-examination, Ramsey acknowledged that Picard never said the name of the person who attacked her. Picard stated only that it was her boyfriend. Ramsey did not ask Picard if she had more than one boyfriend. Ramsey acknowledged that when she heard the male voice yelling, she did not know who it was or what he was saying. While Picard admitted to alcohol use, and her breath smelled of alcohol, Ramsey could not say for sure whether Picard was intoxicated. Finally, Ramsey acknowledged that Picard answered some, but not all, of her questions.

¶ 18    Nurse Sarah Schroepfer testified that she treated Picard in the hospital emergency room on the evening of November 26, 2016. Picard was red and bruised on her face, neck, arms, and legs. Picard told her that she was beaten by the father of her children. Picard was upset and withdrawn. On cross-examination, Schroepfer acknowledged that intoxication or a head injury could affect Picard's ability to recall what happened. Schroepfer testified that Picard did not provide the specific name of the person who had inflicted her injuries.

Following the denial of his motion for a directed finding, the defendant recalled Candace to testify. Candace testified that Picard had five children. Two of the children were fathered by a man named Brian Johnson, one by Joshua Dodd, and one by a man named Timothy. The defendant was the father of one of the five children and was the only father who lived in the vicinity of 1222 Ruby Street in Belvidere.

¶ 19    Following closing argument, the trial court found the defendant guilty of aggravated domestic battery. The trial court stated that the biggest issue in the case was identification. The trial court concluded that Picard's comment to Dietz and Schroepfer that her "boyfriend" had beaten her and the comment to Reese that "Adolfo Palomera" had caused her injuries, was

sufficient to establish that the defendant caused the injuries. The trial court found that the evidence also established the domestic relationship, the *mens rea*, and great bodily harm. The trial court concluded that the lesser included offense of domestic battery merged into the charge for aggravated domestic battery.

¶ 20    On September 30, 2019, before defense counsel filed a posttrial motion, the defendant filed a written *pro se* motion to vacate his conviction and dismiss his indictment. The defendant argued that he was denied his constitutional rights to effective assistance of counsel, to confront the witnesses against him, and to a jury trial. The defendant asserted that trial counsel was ineffective in failing to object to hearsay testimony and in coercing him to waive his right to a jury trial. Specifically, the defendant argued that trial counsel wanted to be finished with trial as quickly as possible and that the defendant waived a jury trial only at the express direction of trial counsel.

¶ 21    Defense counsel moved to withdraw based on the defendant's *pro se* motion. At an October 15, 2019, hearing, at which the defendant was not present, defense counsel stated that he did not think that he could represent the defendant at a sentencing hearing. The sentencing hearing was scheduled for November 12, 2019. The trial court stated that it would not conduct a sentencing hearing on that date but instead would conduct a *Krankel* hearing. See *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 22    On November 12, 2019, a *Krankel* inquiry was not conducted. Rather, the trial court granted the motion to withdraw, and a new privately retained attorney filed an appearance on the defendant's behalf. The trial court stated that, because there was new counsel representing the defendant, there was no need for *Krankel* proceedings, as new counsel would have the opportunity to address any issues involving ineffective assistance of trial counsel.

¶ 23    On March 4, 2020, the defendant filed a motion for a new trial. In that motion, the defendant argued that trial counsel was ineffective in failing to move for a directed finding and in failing to object to testimony from Candace that Picard was "beaten and bruised." The defendant also argued that the evidence was insufficient to support his conviction. At the hearing on the motion, defense counsel argued that the defendant's constitutional right to confront the witnesses against him was violated by the admission of Picard's statements to Reese, Ramsey, and Schroepfer. The trial court denied the defendant's motion. The trial court found that the evidence was sufficient to convict the defendant of the charged offense and that the admission of the challenged statements did not violate the defendant's constitutional rights because the statements were not testimonial.

¶ 24    On September 2, 2020, the trial court held a sentencing hearing. The defendant was subject to mandatory Class X sentencing for this Class 2 felony conviction because he had two prior Class 2 convictions. Candace testified as an aggravation witness for the State that, other than for the injuries at issue in this case, there were two other times when Picard ended up in the hospital while she was dating the defendant. One time was after the defendant smashed Picard's head into a windshield. Picard had bruises on her neck, a bump on her head, and a broken nose. Another time was when a man dropped Picard off at the hospital but then left. Picard was unconscious and the man told hospital personnel that it was a drug overdose. The hospital did not find any drugs in Picard's system, but there was bruising all over her chest.

¶ 25    The State also read victim impact statements from Candace and Picard's daughter. The defendant declined to give a statement in allocution and the defense presented no witnesses. Defense counsel argued that the trial court should consider that the defendant had started to turn

his life around in prison, he was staying sober, and a shorter sentence would improve his chances of rehabilitation.

¶ 26 Following arguments, the trial court stated that it considered the pretrial bond report, the testimony, the victim impact statements, the arguments of the attorneys, the defendant's criminal history, the statutory factors in aggravation and mitigation, and the nature of the offense. The trial court concluded that an appropriate sentence was 16 years' imprisonment, to be served at 85% under truth-in-sentencing and to be followed by 4 years of mandatory supervised release (MSR). The trial court found that the defendant had to serve his sentence consecutively to his sentences for two McHenry County cases involving driving under the influence (Nos. 16-CF-167 and 16-CF-410), because the defendant was out on bond for those cases when he committed the offense at issue in this case. Following the denial of his motion to reconsider his sentence, the defendant filed a timely notice of appeal.

¶ 27                              II. ANALYSIS

¶ 28 On appeal, the defendant argues that the admission of Picard's statements to Officer Reese, paramedic Ramsey, and nurse Schroepfer violated his right to confront the witnesses against him. The defendant also argues that the trial court erred in failing to conduct a *Krankel* inquiry and that his 16-year sentence was excessive.

¶ 29                    A. Admissibility of Hearsay Statements

¶ 30 The defendant's first contention on appeal is that the trial court erred in allowing the admission of out-of-court statements Picard made to Reese, Ramsey, and Schroepfer. To be properly admitted, an out-of-court statement must satisfy both a hearsay exception and a defendant's rights under the confrontation clause. *People v. Martin*, 408 Ill. App. 3d 891, 896 (2011). Prior to trial, the trial court ruled that Picard's out-of-court statements were admissible

under section 115-10.2a of the Code, which allows for the admission of hearsay statements in domestic violence prosecutions when the witness is unavailable to testify and the statements bear "circumstantial guarantees of trustworthiness." See 725 ILCS 5/115-10.2a(a) (West 2016). The defendant does not challenge this ruling. The defendant challenges only the trial court's finding that the statements at issue did not violate the defendant's rights under the confrontation clause because the statements were not testimonial.

¶ 31    The sixth amendment to the United States Constitution provides that, in all criminal prosecutions, the accused shall enjoy the right "to be confronted with the witnesses against him." U.S. Const., amend. VI. The right of confrontation applies to testimonial evidence. Thus, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. A defendant's claim that his sixth amendment right of confrontation was violated raises a question of law, which is reviewed *de novo*. *People v. Barner*, 2015 IL 116949, ¶ 39. Further, whether a statement is testimonial is a question of a law, subject to *de novo* review. *People v. Busch*, 2020 IL App (2d) 180229, ¶ 54.

¶ 32    A statement is testimonial when its "primary purpose *** is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). A statement to law enforcement is deemed "nontestimonial" if the primary purpose of the interrogation is to gather information to meet an ongoing emergency. *Id.* "[A] plurality of [our supreme] court held that a testimonial statement is one which is (1) made in a solemn fashion, and (2) is intended to establish a particular fact." *People v. Sutton*, 233 Ill. 2d 89, 111 (2009) (citing *People v. Stechly*, 225 Ill. 2d 246, 281, 282 (2007) (plurality opinion)). "[A] statement is

testimonial if the declarant is acting in a manner analogous to a witness at trial, describing or giving information regarding events that have already occurred." *Id.*

¶ 33    In the present case, the issue is whether Picard's statements were testimonial. If they were, they are barred by the sixth amendment because the defendant did not have an opportunity to cross-examine Picard. However, if the statements were not testimonial, they are not barred. We will consider Picard's statements in turn.

¶ 34                        1. Statements to Officer Reese

¶ 35    Reese testified that, when he arrived at the scene, he asked Picard what happened. Picard told him that she had an argument with her boyfriend and that he became very abusive and started striking her. Picard told Reese that her boyfriend's name was "Adolfo Palomera," and she gave Reese the address where the injuries were inflicted.

¶ 36    The defendant argues that the statements to Reese were testimonial because the officer was questioning Picard during an investigation into past criminal conduct. The defendant relies on *Davis*, 547 U.S. 813 (consolidated appeal of *Davis v. Washington* and *Hammon v. Indiana*). In *Hammon*, police officers responded to a domestic disturbance and found the victim outside her house, appearing "somewhat frightened." (Internal quotation marks omitted.) *Id.* at 819. She told the officers that "nothing was the matter," and her husband told the officers that he and the victim had "been in an argument" but "everything was fine now." (Internal quotation marks omitted.) *Id.* One officer interviewed the victim while another interviewed her husband, keeping the two apart, despite the husband's attempts to participate in the victim's interrogation. *Id.* at 819-20. The officers then had the victim write an affidavit describing the incident. *Id.* at 820. On review, the Supreme Court held that the victim's statements were testimonial. The Supreme Court explained that there was no ongoing emergency and that the officers learned on arrival that there was no

immediate threat and asked the victim not " 'what is happening,' but rather 'what happened[?]' " *Id.* at 829-30.

¶ 37    In arguing that Picard's statements to Reese were not testimonial, the State relies on *Sutton*, 233 Ill. 2d 89. In *Sutton*, the police responded to a 911 call shortly after midnight regarding a man banging on doors and ringing doorbells. *Id.* at 93. When the officers arrived, they saw a man staggering off a front porch with blood on his face. He told officers he was shot and robbed and that his girlfriend had been shot. He described what the offender looked like and pointed in the direction he had gone. He told the officers the location of his girlfriend, whom they found dead. *Id.*

¶ 38    On appeal, our supreme court held that the statements to the officers at the scene were nontestimonial. *Id.* at 116. The court explained:

> "In this case, even though the offender had apparently fled when the officers arrived on the scene, the circumstances surrounding [the man's] statements to the officers objectively indicate that the officers reasonably assumed an ongoing emergency and acted with the purpose of preventing future harm. The officers arrived on the scene in response to a report of a man banging on doors and ringing doorbells. A bloody and staggering [man] approached the officers and said he had been robbed and shot and that his girlfriend had been shot. In approaching the officers, [the man] was seeking help. At this point, the officers could not have known whether the assailant posed further danger to [the man] or others and did not know whether the violence had ended or might continue elsewhere. The officers did not know whether the perpetrator was still in the immediate area or whether he would return to the area. [The police officer's] questioning *** asking who had done this, where [the] girlfriend was, and where the [offender] went, was part of *** [a] reasonable

effort to assess what had happened and to determine whether there was an ongoing danger to [the man] and others. Viewed objectively, the nature of what was asked and answered was such that the elicited statements were necessary to be able to resolve an ongoing emergency rather than to simply learn what had happened in the past." *Id.* at 115-16.

¶ 39    In the present case, the circumstances are much closer to those in *Sutton*. Here, in response to a report of a battery victim, Reese arrived on the scene to find Picard with a swollen and bleeding face. She was emotional, crying, and seeking help. When Reese asked her what happened, he could not have known where the assailant was, whether the assailant would return, or whether the assailant posed any further danger to Picard or others. Even though Reese asked, "what happened" rather than "what is happening," the question was intended to assess the situation and determine whether there was any ongoing danger. Accordingly, as in *Sutton*, Picard's statements to Reese at the scene were not testimonial, as they were in response to questions intended to resolve an ongoing emergency.

¶ 40    *Hammon* is factually dissimilar to this case. In *Hammon*, when officers arrived at the victim's home, the victim appeared frightened but stated that nothing had happened. Here, in contrast, like the victim in *Sutton*, Picard was in the middle of the street and was bloody, upset, and seeking help. Moreover, the *Hammon* Court rejected the notion that no questions at the scene could yield nontestimonial answers. *Davis*, 547 U.S. at 832. The Court noted that " '[o]fficers called to investigate…need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.' " *Id.* (quoting *Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County*, 542 U.S. 177, 186 (2004)). "Such exigencies may *often* mean that 'initial inquiries' produce nontestimonial statements." (Emphasis in original.) *Id.*

¶ 41    We note that, prior to oral argument in this case, we granted the defendant's motion to cite this court's decision in *Busch*, 2020 IL App (2d) 180229, as additional authority on the issue of whether Picard's statements were testimonial. In *Busch*, this court held that a victim's statements to a homeless shelter employee and a 911 operator were testimonial because there was no ongoing emergency. The facts are as follows. The employee testified that, at 11 a.m. on the day at issue, an unidentified guest at the shelter told her that the victim was outside and needed help. *Id.* ¶ 12. The employee went outside and spoke to the victim, who was sitting at a picnic table. The employee said that the victim was crying and shaking and that it appeared something happened, because the victim had a hard time sitting. *Id.* The employee asked the victim if she wanted an ambulance, but the victim declined. *Id.* ¶ 13. The employee called 911 even though the victim had not asked her to. *Id.* The employee testified that the victim told the 911 operator that she had been beaten with a belt by the defendant all night in a motel. *Id.* ¶ 15.

¶ 42    The recording of the 911 call was played in court. The 911 operator asked the victim a series of questions. The victim told the operator that the defendant had beaten her with a belt all night in a motel room. *Id.* ¶ 17. The victim further stated that later on, when she was walking outside and crying, someone offered to drive her to the shelter. The victim told the operator that she did not need an ambulance, she just wanted to report the incident. The operator then told the victim that the police were on the way. *Id.*

¶ 43    The employee testified that, while waiting for the police, she took the victim to a private office and asked the victim what happened. *Id.* ¶ 20. The victim lifted up the back of her shirt and revealed red welts. The victim said that the defendant had caused the injuries with a belt. *Id.*

¶ 44    In finding the statements to the 911 operator testimonial, we noted that (1) the 911 operator knew that the victim was at the homeless shelter and away from the defendant and (2) the victim

said that she just wanted to report the incident and she did not need an ambulance. *Id.* ¶ 57. We concluded that the statements were testimonial because there was no ongoing emergency and the statements did not describe the events as they were unfolding. *Id.*

¶ 45 In finding the statements to the homeless shelter employee testimonial, we noted that the employee acted in concert with the police because she called 911, listened to the 911 call, and then took the victim to an office and asked questions similar to those asked by the 911 operator. *Id.* ¶ 61. We also noted that the statements were not related to medical treatment or an ongoing emergency because the victim had not asked for medical assistance and the victim was in a safe place—away from the motel and the defendant. *Id.*

¶ 46 *Busch* is distinguishable from the present case. There was no ongoing emergency in *Busch* because it was hours after the incident and the victim was no longer in immediate danger. Further, the victim was not seeking immediate assistance, declined offers to call an ambulance, and stated that she only wanted to report the incident. In the present case, Reese responded to a 911 call regarding Picard banging on Dietz's door late in the evening after dark seeking help. Picard was crying, hysterical, and covered in blood. Even though it was very cold outside, Picard was wearing a tank top and pajama pants and was barefoot. When Reese arrived, Picard was in the middle of the street and her face was bloody and swollen. As explained above, under these circumstances, Reese's questions were to resolve an ongoing emergency and determine whether there was any further danger.

¶ 47                 2. Statements to Paramedic Ramsey and Nurse Schroepfer

¶ 48 The defendant argues that Ramsey and Schroepfer were acting as agents of the police and thus the statements Picard made to Ramsey and Schroepfer were testimonial. Ramsey testified that, when she was treating Picard in the ambulance, she had asked Picard what happened and

whether her hair had been pulled. In response to those questions, Picard described elements of the attack, which Ramsey testified to on direct examination. On cross-examination, the defendant elicited from Ramsey that Picard had stated that the assailant was "her boyfriend." Schroepfer testified that Picard had stated that she was beaten by the father of her children.

¶ 49    In *People v. Munoz-Salgado*, 2016 IL App (2d) 140325, this court addressed whether statements made by a sexual assault victim to an emergency room nurse, while the nurse was performing a sexual assault kit, were testimonial. This court noted that the nurse's role was (1) to collect physical evidence for purposes of investigation and possible prosecution and (2) to ensure that the victim received whatever medical attention was necessary. *Id.* ¶ 14. We noted that the germane issue was whether the verbal exchanges between the nurse and the victim were for the primary purpose of gathering evidence. *Id.* We concluded that they were not, noting: "A medical examination was clearly both necessary and appropriate to ascertain whether [the victim] suffered any injuries and whether treatment was necessary. The examination properly entailed obtaining a history from the patient of the events leading her to visit the emergency room." *Id.*

¶ 50    As in *Munoz-Salgado*, Ramsey's questions about what happened and whether Picard's hair was pulled, and Schroepfer's inquiry as to how the injuries were sustained, were not for the primary purpose of gathering evidence for future prosecution. Rather, the questions were for the purpose of ascertaining what possible injuries Picard may have suffered so that appropriate medical treatment could be provided. Ramsey specifically testified that she asked about the hair-pulling because she wanted to "assess [Picard's] neck." Moreover, there was no evidence that they were acting as agents of the police and there were no police officers in the ambulance or the emergency room. Accordingly, Picard's statements to Ramsey and Schroepfer were not testimonial.

¶ 51    The defendant's reliance on *People v. Spicer*, 379 Ill. App. 3d 441 (2007), is unpersuasive. In *Spicer*, the reviewing court held that a sexual assault victim's statement to an emergency room doctor that she had been "tied and raped" was testimonial. *Id.* at 448. The *Spicer* court's determination was based on the fact that the statement did not occur during the course of an ongoing emergency. However, the United States Supreme Court has since made clear that "whether an ongoing emergency exists is simply one factor *** that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Michigan v. Bryant*, 562 U.S. 344, 366 (2011); accord *State v. Hill*, 336 P.3d 1283, 1288 (Ariz. Ct. App. 2014) ("We cannot say *** that a statement made in response to a question by a medical provider in connection with non-emergent medical care necessarily is testimonial simply because the victim does not require *urgent* medical attention." (Emphasis in original.)).

¶ 52    Further, to the extent that the defendant argues that it was error to admit Picard's statement to Ramsey that the assailant was "her boyfriend," that argument is barred pursuant to the doctrine of invited error. Under the doctrine of invited error, sometimes referred to as "estoppel," a defendant " 'may not request to proceed in one manner and then later contend on appeal that the course of action was in error.' " (Internal quotation marks omitted.) *People v. Lucas*, 231 Ill. 2d 169, 174 (2008) (quoting *People v. Harvey*, 211 Ill. 2d 368, 385 (2004)). Active participation in the direction of proceedings goes beyond mere waiver. *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001). The rationale behind this well-established rule is that it would be manifestly unfair to allow a party to have a second trial based upon the error that that party injected into the proceedings. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004).

¶ 53    Here, the record shows that the defendant invited Ramsey's testimony that Picard stated that the assailant was her boyfriend. On cross-examination, the defendant asked Ramsey whether

Picard had ever stated that the defendant was the assailant. In response, Ramsey testified that Picard had stated only that the assailant was "her boyfriend." The defendant later asked Ramsey whether she had any idea who caused the injuries. Ramsey testified, "[n]o, other than the boyfriend." As the defendant invited this testimony, he is barred from now arguing that it violated his sixth amendment right to confront the witnesses against him. *Lucas*, 231 Ill. 2d at 174.

¶ 54                                              B. *Krankel* Hearing

¶ 55    The defendant's next contention on appeal is that the trial court erred in not conducting a preliminary *Krankel* inquiry after he filed his *pro se* posttrial motion raising claims of ineffective assistance of trial counsel. See *Krankel*, 102 Ill. 2d at 189 (1984) (establishing a procedure for trial courts to follow when a defendant makes *pro se* posttrial claims of ineffective assistance). The defendant argues that the appropriate remedy is to remand for an inquiry into his *pro se* posttrial claims.

¶ 56    The purpose of a *Krankel* proceeding "is to facilitate the trial court's full consideration of a defendant's *pro se* claims of ineffective assistance of trial counsel and thereby potentially limit issues on appeal." *People v. Jolly*, 2014 IL 117142, ¶ 29. A *Krankel* inquiry proceeds in two stages. First, when a defendant brings a *pro se* posttrial claim alleging ineffective assistance of trial counsel, *Krankel* requires the trial court to inquire into the factual basis of the claim. *People v. Downs*, 2017 IL App (2d) 121156-C, ¶ 43. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the trial court may deny the *pro se* motion. *Id.* However, if the allegations show possible neglect of the case, new counsel should be appointed (*i.e.*, *Krankel* counsel), and the matter proceeds to the second stage. *Id.* "The second stage consists of an adversarial and evidentiary hearing on the defendant's claims, and during this hearing the defendant is represented by *Krankel* counsel." *Id.*

¶ 57    The State argues that, regardless of whether the trial court erred in failing to conduct a preliminary *Krankel* inquiry, any error was invited by the defendant, because he failed to object at the November 2019 hearing when the trial court stated that it was not going to conduct a *Krankel* inquiry. We reject this argument because, under these circumstances, the doctrine of invited error is not applicable. Merely failing to object to a procedure proposed by the trial court does not amount to invited error. *People v. Coan*, 2016 IL App (2d) 151036, ¶ 24.

¶ 58    The State further argues, relying on *People v. Pecoraro*, 144 Ill. 2d 1, 15 (1991), that a *Krankel* inquiry is not required when, as in this case, a defendant is represented by retained counsel of his choosing and has not requested alternate counsel. In *Pecoraro*, the defendant argued on appeal that the case should be remanded for *Krankel* proceedings because alternate counsel was not appointed to argue his posttrial motions alleging ineffective assistance of counsel. Our supreme court held that *Krankel* was inapplicable because the defendant retained his own private counsel and did not request other counsel. *Id.* at 15. However, the underlying circumstances in *Pecoraro* were quite different from the present circumstances. In *Pecoraro*, the trial court heard both defense counsel's and the defendant's motions for a new trial based on claims of ineffective assistance of counsel. *Id.* at 13. The trial court determined that the claims of ineffective assistance raised by the defendant involved matters of trial strategy. *Id.* The trial court further concluded that the defendant was given an excellent defense and that he had received competent representation. *Id.* at 14. Accordingly, in *Pecoraro*, the trial court did inquire into the defendant's *pro se* claims of ineffective assistance and concluded that they were without merit. The trial court thereby satisfied the requirements of *Krankel*. *People v. Nitz*, 143 Ill. 2d 82, 134 (1991) (if the trial court conducts a preliminary inquiry into the defendant's *pro se* allegations of ineffective assistance and determines them to be spurious or pertaining only to trial tactics, no new counsel need be appointed

to represent the defendant). In the present case, unlike in *Pecoraro*, the trial court never inquired into the defendant's *pro se* claims of ineffective assistance and, thus, did not satisfy the requirements of *Krankel*. We therefore find the State's reliance on *Pecoraro* unpersuasive.

¶ 59    Rather, in determining whether the trial court satisfied the requirements of *Krankel*, we find *People v. Reed*, 2018 IL App (1st) 160609, instructive. In that case, the defendant filed a *pro se* posttrial motion alleging ineffective assistance of counsel. *Id.* ¶ 30. Based on that motion, the trial court allowed privately retained trial counsel to withdraw at the next court appearance. New private defense counsel then filed an amended motion for a new trial, arguing, in part, that the defendant "was denied the effective assistance of counsel at trial." *Id.* ¶ 31. At the hearing on the motion for a new trial, posttrial defense counsel did not address the ineffective assistance of trial counsel claim. *Id.*

¶ 60    On appeal, the reviewing court held that the proceedings did not properly conform to the requirements of *Krankel* because the trial court had not conducted an examination of the factual bases of the defendant's *pro se* claim of ineffective assistance of counsel. *Id.* ¶ 51. The reviewing court specifically noted that "[a]llowing trial counsel to withdraw and appointing new posttrial defense counsel does not satisfy *Krankel* procedure" and that the law required some type of inquiry into the underlying factual basis of the defendant's *pro se* claim. *Id.* The reviewing court also noted that, even after new counsel appeared, there was no indication in the record that he was proceeding as *Krankel* counsel. *Id.* ¶ 52. Specifically, posttrial counsel did not reference the defendant's *pro se* motion and did not provide specific examples of trial counsel's actions that would have supported a claim for ineffective assistance. *Id.* Accordingly, the case was remanded for a preliminary *Krankel* inquiry. *Id.* ¶ 53.

¶ 61    In the present case, as in *Reed*, the trial court never made an inquiry into the defendant's

*pro se* allegations of ineffective assistance of counsel to determine whether a second stage *Krankel*

hearing was warranted. Accordingly, as in *Reed*, the proceedings in this case did not satisfy the

requirements of *Krankel*. *Id.*; see *People v. Kyles*, 2020 IL App (2d) 180087, ¶ 36 (following *Reed*

and holding that the general appointment of new counsel does not eliminate the trial court's

obligation to make a preliminary inquiry into the merits of a defendant's *pro se* claims of

ineffective assistance); see also *People v. Roberson*, 2021 IL App (3d) 190212, ¶ 21 (appointment

of new counsel did not satisfy requirements of *Krankel* where there was no further litigation of the

defendant's claims of ineffective assistance of counsel). When a defendant raises *pro se* claims,

the substance of which raise a claim of ineffective assistance of counsel, the trial court is required

to conduct a preliminary *Krankel* inquiry and to ensure that the record shows that it fulfilled this

duty.

¶ 62    Nonetheless, even if a reviewing court finds that a trial court made an error, it will not

reverse if it finds that the error was harmless. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 29

(holding that the trial court's failure to conduct a preliminary *Krankel* inquiry was harmless error);

see *People v. Skillom*, 2017 IL App (2d) 150681, ¶ 28 (noting that our supreme court has never

held that errors committed during a preliminary *Krankel* hearing could never be subject to

harmless-error review).

¶ 63    In the present case, we hold that the trial court's failure to conduct a preliminary *Krankel*

inquiry was harmless error. The defendant raised two claims in his *pro se* posttrial motion. He

argued that trial counsel failed to object to hearsay testimony and that he was coerced into waiving

his jury trial. The defendant's new counsel raised the first claim in his motion for a new trial.

However, because trial counsel had objected to the State's motion to admit hearsay testimony, the

claim was reframed as an argument that the trial court erred in admitting the hearsay testimony. As noted earlier, the trial court considered and rejected this claim.

¶ 64    New counsel did not raise the second *pro se* claim, that the defendant's jury waiver was improperly coerced. However, this claim is positively rebutted by the record. The record shows that, before the trial court accepted the defendant's jury waiver, it questioned the defendant twice as to whether anyone was forcing him to waive his right to a jury. In response to both questions, the defendant affirmatively indicated that he was not being forced. Further, the defendant indicated that he believed that a bench trial was "absolutely" his best choice. Accordingly, under the circumstances in the present case, where the defendant's claims were either addressed by the trial court or positively rebutted by the record, the trial court's failure to conduct a preliminary inquiry under *Krankel* was harmless. While we so hold, we emphasize that the better course is for the trial court to conduct a preliminary inquiry and to make it clear from the record that it considered the defendant's claims.

¶ 65                                      C. Excessive Sentence

¶ 66    The defendant's final contention on appeal is that his sentence is excessive in light of his rehabilitative potential and the adverse financial impact on Illinois taxpayers. The defendant argues that he had never been sentenced to a prison sentence longer than five years. The defendant further argues that the evidence showed that the offense was largely related to his alcohol abuse and his rehabilitative potential was demonstrated through his participation in treatment while incarcerated.

¶ 67    The Illinois Constitution states "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all

aggravating and mitigating factors, including "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 68     "[T]he trial court is in the best position to fashion a sentence that strikes an appropriate balance between the goals of protecting society and rehabilitating the defendant." *People v. Risley*, 359 Ill. App. 3d 918, 920 (2005). Thus, we may not disturb a sentence within the applicable sentencing range unless the trial court abused its discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). A sentence is an abuse of discretion only if it is at great variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Id.* at 210. We may not substitute our judgment for that of the trial court merely because we might weigh the pertinent factors differently. *Id.* at 209.

¶ 69     In determining an appropriate sentence, relevant considerations include the nature of the crime, the protection of the public, deterrence, and punishment, as well as the defendant's rehabilitative prospects. *People v. Kolzow*, 301 Ill. App. 3d 1, 8 (1998). The weight to be attributed to each factor in aggravation and mitigation depends upon the particular circumstances of the case. *Id.* There is a presumption that the trial court considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors or relied on improper aggravating factors. *People v. Payne*, 294 Ill. App. 3d 254, 260 (1998).

¶ 70     After reviewing the record, we conclude that the trial court did not abuse its discretion when it sentenced the defendant to 16 years' imprisonment. The defendant acknowledges that he was subject to Class X sentencing (see 730 ILCS 5/5-4.5-95(b) (West 2016)) and that his

sentencing range was between 6 and 30 years' imprisonment. Because the defendant's 16-year sentence fell within the applicable sentencing range, we presume that the sentence is proper. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16. This presumption will be rebutted only if the defendant makes an affirmative showing that the sentence greatly departs from the spirit and purpose of the law or the constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). The defendant has not made such a showing.

The defendant argues that the trial court did not place enough weight on his rehabilitative potential, noting that he had participated in substance abuse treatment while incarcerated. However, at the hearing on the defendant's motion to reconsider his sentence, the trial court stated that it considered the defendant's treatment and his useful return to citizenship. Further, the trial court stated that it considered the presentence investigation report, which showed an extensive criminal history, including five prior convictions of driving under the influence, the first one dating back to 2006, demonstrating a history of failed substance abuse treatment. The defendant essentially asks this court to reweigh the evidence in aggravation and mitigation. We decline to reweigh the evidence or substitute our judgment for that of the trial court. *Stacey*, 193 Ill. 2d at 209.

¶ 71    The defendant also argues that the trial court did not consider the financial impact of his incarceration on taxpayers. See 730 ILCS 5/5-4-1(a)(3) (West 2016) (sentencing court "shall" "consider the financial impact of incarceration based on the financial impact statement filed with the clerk of the court"). A trial court is not required to specify on the record the reasons for a defendant's sentence, and, absent evidence to the contrary, the trial court is presumed to have performed its obligations and considered the financial impact statement before sentencing a defendant. *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 24. In the present case, there is nothing in the record to rebut the presumption that the trial court considered the financial

impact of defendant's imprisonment before sentencing him. Therefore, we presume that the trial court acted in accordance with the law and conclude that it did not abuse its discretion in imposing the defendant's 16-year sentence.

¶ 72                                 III. CONCLUSION

¶ 73     For the reasons stated, the judgment of the circuit court of Boone County is affirmed.

¶ 74     Affirmed.

---

**No. 2-20-0631**

---

| | |
|---|---|
| **Cite as:** | *People v. Palomera*, 2022 IL App (2d) 200631 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Boone County, No. 17-CF-121; the Hon. C. Robert Tobin III, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Kathleen Weck, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Tricia L. Smith, State's Attorney, of Belvidere (Patrick Delfino, Edward R. Psenicka, and Pamela S. Wells, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---