2023 IL App (1st) 191916-U

No. 1-19-1916

Order filed March 31, 2023

FIFTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 1397101 |
| | ) | |
| TOMMIE HARRIS, | ) | Honorable |
| | ) | Maura Slattery Boyle, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Delort and Justice Mitchell concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the judgment of the circuit court over the defendant's contentions that the court erred in denying his motion to suppress his custodial statement to police, that his trial counsel was ineffective in failing to challenge his custodial statement on the grounds that it was involuntary and in failing to pursue a claim of second degree murder based on imperfect self-defense, that the court erred in rejecting his posttrial claims of ineffective assistance of trial counsel, and that his posttrial counsel was ineffective in failing to adequately raise the issue of trial counsel's ineffectiveness. We also vacate two of the defendant's convictions for first degree murder pursuant to the one-act, one-crime rule, and we correct the mittimus.

¶ 2    Following a bench trial, defendant Tommie Harris was found guilty of first degree murder for the shooting death of Shavonte Howard. The trial court subsequently sentenced Mr. Harris to the minimum term of imprisonment of 45 years. The charges stemmed from an incident where Mr. Harris fired a gun from a vehicle into another vehicle where Mr. Howard was a passenger. The bullet struck Mr. Howard in the head, killing him. Mr. Harris was arrested and eventually gave an inculpatory statement to police. Prior to trial, the court denied Mr. Harris' motion to suppress his custodial statement over his contention that he invoked his right to remain silent before he gave the inculpatory statement. The court found Mr. Harris guilty of first degree murder, rejecting his claim of self-defense based on his custodial statement and the other evidence presented.

¶ 3    On appeal, Mr. Harris contends that the trial court erred in denying his motion to suppress his inculpatory statement to police where he indicated that he did not want to continue speaking with the police, but the detectives continued to question him eventually extracting the inculpatory statement. He also asserts that his trial counsel was ineffective in failing to seek to suppress his inculpatory statement on the additional ground that the statement was involuntary where the detectives lied to him and refused to allow him to make a phone call to his mother. Mr. Harris further contends that his trial counsel was ineffective in failing to request that the trial court consider second degree murder based on imperfect self-defense, rather than solely pursuing the "all-or-nothing" claim of self-defense. Mr. Harris also maintains that the trial court erred in denying his motion for a new trial where the court did not adhere to the procedure outlined in *People v. Krankel*, 102 Ill. 2d 181 (1984) because the court did not question his trial counsel about the claims of ineffective assistance. Finally, Mr. Harris asserts that this court should vacate two of his convictions for first-degree murder based on the one-act, one crime rule. For the reasons that

follow, we affirm the judgment of the circuit court of Cook County in part, vacate two of the first degree murder convictions, and correct the mittimus.

¶ 4                                    I. BACKGROUND

¶ 5                                 A. Motion to Suppress

¶ 6    Before trial, Mr. Harris filed a motion to suppress his custodial statements to police. In the motion, Mr. Harris contended that after he was arrested, he was taken to the police station where he was placed into an interrogation room. After being advised of his *Miranda* rights, Mr. Harris told the detectives that he did not know what happened. The detectives asked Mr. Harris if he wanted to talk to them, and he responded, " 'I don't want to talk to nobody.' " Mr. Harris maintained that any statements he made after the invocation of his right to remain silent were obtained in violation of the fifth amendment of the United States Constitution. U.S. Const., amend. V.

¶ 7    At the suppression hearing, Chicago police detective Scott Reiff testified regarding his interrogation of Mr. Harris at the police station. Detective Reiff testified that Mr. Harris had been arrested with four other individuals who were placed in nearby interrogation rooms. Detective Reiff noted that Mr. Harris and his co-arrestees were talking to each other through the walls of the interrogation rooms.

¶ 8    Detective Reiff and his partner entered the interrogation room where Mr. Harris was being held and advised him of his *Miranda* rights. Mr. Harris indicated that he understood his rights as Detective Reiff read them. After being advised of his rights, Mr. Harris stated that he wanted to speak with the detectives. After speaking with the detectives for a few minutes, Mr. Harris stood up and whispered into Detective Reiff's ear that he was concerned that the co-arrestees in the

neighboring interrogation rooms could hear him talking to the detectives. After Mr. Harris expressed this concern, Detective Reiff left the interrogation room and interviewed the four other arrestees. Detective Reiff then brought all four them down to the lockup to be processed, leaving the interrogation rooms empty.

¶ 9     Detective Reiff then returned to the interrogation room where Mr. Harris was being held. Detective Reiff showed Mr. Harris that the other rooms were empty and that the other arrestees were no longer in the same area. Detective Reiff questioned Mr. Harris for approximately half an hour. Later that evening, Mr. Harris acknowledged his involvement in the shooting.

¶ 10     The State then played a portion of Mr. Harris' electronically recorded interview (ERI). The portion played for the court began at 17:29:25 and ended at 17:36:27. At defense counsel's request, the State replayed the recording. The State then requested to play another "30 minute[]" portion of Mr. Harris' ERI, but defense counsel objected. Defense counsel stated that during the portion of the interview that was already played, Mr. Harris stated that he did not want to talk to anyone. Defense counsel stated that after Mr. Harris made that statement, the interview should have ended and anything that happened afterward did not relate to the motion to suppress. The court overruled defense counsel's objection explaining that it had to determine whether Mr. Harris gave his inculpatory statement voluntarily or whether it was coerced.

¶ 11     The State then played a second portion of Mr. Harris' ERI, but the timestamps, if any were given at the hearing, are not included in the report of proceedings filed on appeal. Nonetheless, the State asked Detective Reiff to describe what occurred in the portion of the ERI that was played. Detective Reiff testified that the recording showed him and another detective enter the interview room and explain to Mr. Harris that the surrounding interview rooms were now empty. The

detectives then permitted Mr. Harris to look into the other interview rooms to ensure that they were empty. Detective Reiff testified that Mr. Harris then returned to the interview room and continued to speak with the detectives. In response to the question: "At any time did [Mr. Harris] invoke his right to remain silent?" Detective Reiff responded: "No."

¶ 12    On cross-examination, Detective Reiff acknowledged that Mr. Harris initially said that he did not want to talk, but "mumbled" and did not "really complete his sentence and make his point." Detective Reiff believed that Mr. Harris' greatest concern at the time was that he did not want his co-arrestees in the adjacent rooms to hear what he was saying. Detective Reiff testified that after Mr. Harris indicated that he did not want to talk, Detective Reiff informed him that they had to speak in the interview room. At that point, Mr. Harris expressed his concerns about his co-arrestees being able to hear him speaking. Detective Reiff testified that Mr. Harris' concern was "obviously them hearing what he was saying." Detective Reiff did not believe that when Mr. Harris stated that he did not want to talk in the interview room that he was invoking his right to remain silent.

¶ 13    The trial court denied the motion to suppress in an oral ruling. The court stated that it listened very closely to the ERI video and heard Mr. Harris state that he did not want to talk in the interview room. Detective Reiff then told Mr. Harris that they had to talk in the interview room. Mr. Harris then "shrug[ged] his shoulders" and told the detectives to "just talk." The court found that this did not constitute an invocation of the right to remain silent. The court concluded that Mr. Harris was clearly only concerned about talking in the interview room where he could potentially be overheard by his co-arrestees and was not invoking his right to remain silent.

¶ 14                                      B. Trial

¶ 15    Mr. Harris was tried jointly in a severed, but simultaneous bench trial with co-defendant Quinton Humphries. The State's first witness was Malcolm Turner, who was the driver of the vehicle where Mr. Howard was a passenger. Mr. Turner acknowledged that he had previously been convicted of aggravated unlawful use of a weapon and residential burglary. Mr. Turner denied being a gang member, but stated that he was "affiliated" with a gang that was a faction of the Gangster Disciples. He testified that in 2013 the Gangsters Disciples were "into it" with the Black P. Stones street gang. Mr. Turner testified that on the date of the incident, he was driving a burgundy Pontiac Grand Prix when he picked up Mr. Howard at his home near West 54th Street and South Hoyne Avenue. The two were going to the car wash and then to get a haircut. As he was driving to the car wash, Mr. Turner noticed a red Dodge Charger pull up beside his vehicle at an intersection. Mr. Turner testified that the driver of the red Charger was "hanging out [of] the window" yelling at him. Mr. Turner did not recognize the driver at the time of the incident, but identified co-defendant Mr. Humphries as the driver of the vehicle in court. Mr. Turner could not see anyone else in the red Charger because the vehicle's windows were tinted.

¶ 16    Once the traffic light turned green, Mr. Turner started to make a left turn, when he heard a gunshot. Mr. Turner ducked down and heard the bullet bounce around inside the vehicle. He looked at Mr. Howard in the passenger seat who "was like basically sleep [*sic*], snoring, blood everywhere." Mr. Turner drove to Mr. Howard's house where he told Mr. Howard's mother that Mr. Howard had been shot in the head. Mr. Howard's father told Mr. Turner to take Mr. Howard to the hospital. Mr. Turner testified that he drove to Mr. Howard's house first because he believed that it was the safest place to go because he did not know where the red Charger had gone after the

shooting. En route to the hospital, Mr. Turner observed a police vehicle and "waived him down." The police vehicle trailed Mr. Turner on the way to the hospital.

¶ 17    At the hospital, police officers questioned Mr. Turner about what had occurred. Mr. Turner gave the police officers a description of the other driver and the other driver's vehicle. A short time later, police officers brought a person to the hospital for Mr. Turner to identify. Mr. Turner identified him, Mr. Humphries, as the driver of the red Charger. Mr. Turner testified that he did not have a gun on him at the time of the incident, but if he did, he would have "shot first" because he could hear the driver of the red Charger saying that he was going to kill them. He also did not see Mr. Howard with a gun that day.

¶ 18    On cross-examination, Mr. Turner testified that he did not call 9-1-1 from his vehicle after he saw that Mr. Howard had been shot because he was panicking. Mr. Turner acknowledged that he told police officers on the scene that he could not hear what the driver of the red Charger was saying because the volume on his radio was turned up too loud. He did tell the officers that he saw the driver was "gang bangin [*sic*]" with him. Mr. Turner never saw anyone with a gun and did not know where the gunshot came from. The only person he saw in the red Charger was co-defendant Mr. Humphries who was driving, but Mr. Turner did not see a weapon of any kind in his hand.

¶ 19    Devontae Stokes testified that he was currently incarcerated for aggravated identity theft, access device fraud, and manufacturing and delivering access devices. Mr. Stokes testified that in July 2013, he was a Black P. Stone Ranger from the Back of the Yards. He testified that he knew Mr. Humphries from the neighborhood and he was also a member of the Black P. Stones. Mr. Stokes did not know Mr. Harris at the time, but knew of him, and had seen him around the neighborhood. Mr. Stokes testified that Mr. Harris was a member of the Gangster Disciples. Mr.

Stokes also knew Mr. Turner as a member of the Gangster Disciples. Mr. Stokes testified that in the summer of 2013 there was "friction" between the Black P. Stones and the Gangster Disciples, which included shootings back and forth between the two gangs.

¶ 20    On the morning of July 4, 2013, Mr. Stokes called Mr. Humphries and asked him to pick him up. Mr. Humphries arrived shortly thereafter in a red Dodge Charger. Mr. Stokes observed that Enos Washington, Mr. Humphries' step-brother, was in the front passenger seat and Mr. Harris was in the backseat behind Mr. Humphries. Mr. Stokes testified that as the vehicle made a left turn onto Western Avenue, Mr. Turner "approached" them in a red Grand Prix "throwing gang signs and trying to cut [them] off." Mr. Stokes testified that Mr. Turner drove the vehicle in front of the red Charger and attempted to "block [them] off." Mr. Stokes observed Mr. Turner making gang signs toward Mr. Humphries, and Mr. Humphries responded by making gang signs back toward Mr. Turner. Mr. Stokes did not see anyone besides Mr. Turner in the red Grand Prix.

¶ 21    Mr. Stokes testified that they continued driving down Western Avenue while Mr. Turner tried to position his vehicle in front of the red Charger. Mr. Turner began to turn his vehicle east onto East 56th Street. Mr. Stokes then saw Mr. Harris retrieve a gun from under his seat and fire a single shot toward Mr. Turner's vehicle. Mr. Stokes saw Mr. Harris with his arm extended outside of the car window, which had been lowered, and saw Mr. Harris pull the trigger. Mr. Stokes did not see Mr. Turner or anyone else in the Grand Prix with a gun. After the shooting, Mr. Stokes saw Mr. Harris place the gun under his seat.

¶ 22    Mr. Stokes acknowledged that after he was arrested, he spoke to police officers in an interview room at the police station. Mr. Stokes told the officers that when they first observed Mr. Turner's vehicle, Mr. Humphries pointed out the vehicle and then said that Mr. Harris was

"thirsty." Mr. Humphries told Mr. Harris to retrieve the gun from under the seat. Mr. Stokes acknowledged that before the grand jury he testified that after Mr. Humphries told Mr. Harris to retrieve the gun, Mr. Harris stated, " 'Let me do his a***. I got this.' [Mr. Harris] was like anxious to shoot at [Mr. Turner.]" Mr. Stokes believed that by saying "Let me do his a***," Mr. Harris was asking to be the one to shoot Mr. Turner.

¶ 23     On cross-examination, Mr. Stokes testified that he did not see Mr. Turner with a gun, nor did he hear anyone in red Charger state that Mr. Turner had a gun. Mr. Stokes testified that because of the red Charger's tinted windows, he had difficulty seeing out of the vehicle, and could not tell if there was a passenger in Mr. Turner's car. Mr. Stokes testified that he was afraid when he saw Mr. Turner drive up beside them because Mr. Turner had a reputation as a gang member who was "[a]lways shooting somebody."

¶ 24     Officer Miles[1] testified that he was on patrol with his partner in the area of West 55th Street and South California Avenue when he observed a red Pontiac driving "erratically" through traffic. Officer Miles followed the vehicle to Holy Cross Hospital where it stopped at the emergency entrance. Officer Miles and his partner exited their vehicle and approached the driver of the red Pontiac who told them that his passenger had been shot. Officer Miles observed that the passenger was bleeding from his head and was unconscious. Officer Miles noted that the passenger's seat was tilted back, "past the door frame for the front and back of the car." The driver of the red Pontiac told Officer Miles that he had an altercation with the occupants of a red Dodge Charger and gave him a physical description of the other driver.

---

[1]Officer Miles' first name does not appear in the transcript of the trial proceedings filed on appeal.

¶ 25    Officer Markus Williams testified that he conducted a traffic stop of the red Dodge Charger. He ordered the occupants, including Mr. Harris, out of the vehicle. Officer Williams saw the "butt of a handgun" protruding from underneath the seat that Mr. Harris was sitting in.

¶ 26    Officer Alaniz[2] testified that he received a radio call of shots fired and proceeded to the indicated location. There, he observed a red Dodge Charger that had already been stopped by police that matched the description of the vehicle involved in the shooting. Officer Alaniz approached the vehicle and saw five individuals inside, including Mr. Humphries and Mr. Harris who was sitting in the backseat behind the driver. Officer Alaniz transported Mr. Humphries to Holy Cross Hospital where Mr. Turner identified Mr. Humphries as the driver of the red Dodge Charger.

¶ 27    Detective Reiff testified regarding his interview of Mr. Stokes at the police station following the shooting. Mr. Stokes told Detective Reiff that Mr. Humphries was driving the vehicle and Mr. Harris fired the gun. Detective Reiff also testified regarding his interview of Mr. Harris. Detective Reiff reiterated his testimony from the hearing on the motion to suppress including Mr. Harris' inculpatory statement. The State then published a portion of Mr. Harris' ERI beginning at 7:54 p.m. where he made the inculpatory statement to detectives.

¶ 28    On cross-examination, Detective Reiff acknowledged that he did not know whether the gun shot residue test would show that Mr. Harris had fired a gun despite telling Mr. Harris that it would show that he did. Detective Reiff acknowledged that Mr. Harris asked to make a phone call to his mother, but testified that it was department policy to not let people make phone calls in those

_____

[2]Officer Alaniz's first name does not appear in the transcript of the trial proceedings filed on appeal.

situations. Detective Reiff also acknowledged that he lied to Mr. Harris about whether or not Mr. Howard was still alive during their interview.

¶ 29    The parties stipulated that a medical examiner would testify that Mr. Howard's cause of death was a gunshot wound to the head, and that the gunshot residue tests did not reveal any gunshot residue on Mr. Harris' body or clothing.

¶ 30    Prior to trial, Mr. Harris joined co-defendant Mr. Humphries' motion seeking to admit evidence of Mr. Turner's prior violent acts pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984). The court granted the motion in part, permitting three witnesses to testify at trial to Mr. Turner's prior violent acts.

¶ 31    In support of their motion, the defense first presented the testimony of Mr. Humphries' nephew, Tyree Humphries (Tyree). Tyree testified that he was a member of the Jack Boys street gang and he knew Mr. Turner as "one of the leaders" of their rival gang, the Gangster Disciples. Tyree testified that in September 2013, he was with another member of the Jack Boys, Bryon Champ, when Mr. Turner approached them and swung a two-by-four board at Mr. Champ. Tyree and Mr. Champ ran away, but Mr. Turner chased after them with a group of people that Tyree assumed were other members of the Gangster Disciples. Tyree and Mr. Champ split up and Mr. Turner eventually caught up to Tyree in an empty parking lot. Mr. Turner tackled Tyree to the ground and hit him twice in the head with a brick. Tyree was knocked unconscious and woke up alone on the ground of the empty parking lot.

¶ 32    Mr. Champ testified that in 2013 he was a member of Jack Boys street gang and the Black P. Stones. Mr. Champ testified that the Gangster Disciples were the rivals of the Jack Boys. Mr. Champ knew Mr. Turner as a member of the Gangster Disciples and knew Mr. Turner as one of

the gang's "little shooters." Mr. Champ testified that in September 2013, he was heading to Wal-Mart with Tyree when they were approached by Mr. Turner and six other people. Mr. Turner attempted to hit them with a two-by-four board and then they ran. The group chased after Mr. Champ but were unable to catch him.

¶ 33    A week later, Mr. Champ was standing on the sidewalk near West 52nd Street and South Paulina Street when three individuals, including Mr. Turner, attempted to get his attention. Mr. Champ ignored them, and Mr. Turner left. Mr. Turner later returned with a black, semiautomatic handgun and started shooting at Mr. Champ. Mr. Champ testified that Mr. Turner fired the gun at him "[l]ike 45" times, and hit him once in his right leg.

¶ 34    Mr. Washington, Mr. Humphries' half-brother, testified that he was a member of the Black P. Stones street gang and their rival was the Gangster Disciples. Mr. Washington testified that he knew Mr. Turner as the "head rival" of the Gangster Disciples. Mr. Washington testified that in June 2013, he was with Mr. Harris in the area of West 53rd Street and South Marshfield Avenue. As they were standing on the corner, Mr. Turner approach them on a moped. Mr. Turner pulled out a black, semiautomatic pistol and started shooting at them from about 30 or 40 feet away. Mr. Washington and Mr. Harris ducked down behind some cars to avoid being shot by Mr. Turner.

¶ 35    Mr. Washington further testified that he was in the vehicle a few days later during the shooting in this case. Mr. Washington testified that they were stopped at a red light when Mr. Humphries announced to the occupants of the vehicle that Mr. Turner had pulled up behind them. When the light turned green, Mr. Humphries turned left, and Mr. Turner followed them in his vehicle. Mr. Turner attempted to cut off Mr. Humphries, forcing him to collide with the parked vehicles along the side of the street. Mr. Humphries and Mr. Turner started to "exchang[e] harsh

words through the open window." Mr. Washington saw Mr. Howard sitting in the passenger seat in Mr. Turner's vehicle and saw that Mr. Howard was holding a dark, semiautomatic pistol. Mr. Washington ducked down and Mr. Humphries slammed on the brakes. Mr. Turner then drove his vehicle in front of them and stopped in the middle of the street, waiting for them to catch up. As they drove by, Mr. Washington heard a gunshot and thought that Mr. Turner or Mr. Howard had shot at them. Mr. Washington later noticed Mr. Harris placing a gun underneath his seat. Mr. Washington did not know the gun was in the car and did not hear anyone tell Mr. Harris to fire the gun.

¶ 36    On cross-examination, Mr. Washington testified that he saw Mr. Howard pull the gun either out of his waistband or out of the center console inside of Mr. Turner's vehicle. As soon as they saw Mr. Howard pulling out the gun, Mr. Humphries stopped the vehicle, so Mr. Washington was unable to see if Mr. Howard held up the gun or if he pointed at their vehicle. After he saw the gun, Mr. Washington called out to the rest of the occupants in the car that "he got a gun." Mr. Washington acknowledged that he did not tell police that he saw Mr. Howard with a gun before the shooting. The defense then introduced into evidence a video from YouTube that purports to show Mr. Turner rapping about being a "Jack Boy killer" and flashing gang signs.

¶ 37                                    C. Circuit Court Ruling

¶ 38    Following closing arguments, the trial court made a lengthy oral ruling. The court first reviewed the facts finding that Mr. Howard was reclined so far back in Mr. Turner's vehicle that "nobody can see him." The court found that therefore none of the occupants of the red Dodge Charger knew that Mr. Howard was in the vehicle with Mr. Turner. The court acknowledged that after Mr. Howard was shot, Mr. Turner made the decision to drive to Mr. Howard's house, rather

than driving him to the hospital. The court acknowledged that this was not the "smartest thing to do," but it recognized that Mr. Turner believed it was safer than going to the hospital under the circumstances.

¶ 39    In addressing, Mr. Harris' claim of self-defense, the court stated that it reviewed the footage of the vehicles turning onto Western Avenue. The court stated that it also went through and "extensively" reviewed Mr. Harris' ERI. The court found that Mr. Harris never told the officers during the ERI that he believed Mr. Turner or Mr. Howard had a gun. The court found that Mr. Harris repeatedly changed his version of events regarding his involvement in the shooting, first telling the detectives that he was not involved until eventually admitting that he fired the single gunshot. The court concluded that the State proved Mr. Harris guilty of first degree murder beyond a reasonable doubt based on "the statement of Mr. Harris, the forensics, [and] the testimony of the witnesses," including Mr. Stokes' testimony regarding who the shooter was and where the shooter was sitting.

¶ 40                        D. Motion for New Trial

¶ 41    Following the court's verdict, Mr. Harris' trial counsel was disbarred by consent for reasons unrelated to Mr. Harris' case. New counsel appeared on the case, but later withdrew due to a conflict of interest because Mr. Harris was going to raise posttrial claims of ineffective assistance of trial counsel pursuant to *Krankel*, 102 Ill. 2d 181. The trial court then appointed a public defender to represent Mr. Harris. Mr. Harris' new counsel ("posttrial counsel") filed an amended motion for a new trial. In the motion, posttrial counsel raised numerous objections to both the trial court's ruling and the performance of Mr. Harris' trial counsel. Posttrial counsel argued that the court erred in denying the motion to suppress because Mr. Harris stated that he did

not "want to talk to nobody," and that the court erred in rejecting Mr. Harris' claim of self-defense. With regard to trial counsel, posttrial counsel asserted that trial counsel was ineffective in that he only met with Mr. Harris one time at the Cook County jail and failed to meaningfully discuss with Mr. Harris the nature of the proceedings and the trial strategy. Posttrial counsel further maintained that trial counsel was ineffective where he failed to call any witnesses or introduce any evidence in support of the motion to suppress or in support of the claim of self-defense.

¶ 42    The trial court held a hearing on the motion for a new trial where Mr. Harris testified regarding his claims of ineffective assistance of trial counsel. Mr. Harris testified that his trial counsel visited him only once while he was in jail a day or two before the trial began. He further testified that his trial counsel never showed him any of the statements or exhibits and never discussed the trial strategy with him, such as whether to elect for a bench trial or a jury trial. Mr. Harris testified that he told his trial counsel that he wanted to testify, but his counsel told him that he wanted to "beat" the case, and he did not need him to testify because Mr. Washington would provide the same testimony. Mr. Harris further testified that he asked for a "[plea] offer," but his trial counsel never gave him one or informed him if the State had made one. He testified that his trial counsel did not discuss the motion to suppress with him.

¶ 43    Mr. Harris then testified regarding interactions he had with Mr. Turner prior to the shooting in this case. Mr. Harris recounted two times that Mr. Turner had shot at him, including the incident that was the subject of Mr. Washington's testimony. Mr. Harris also testified that he was aware of other violent incidents involving Mr. Turner where Mr. Harris was not involved. He told his trial counsel that he wanted to testify about those incidents, but his trial counsel did not call him to

testify, nor did his trial counsel inform him that his state of mind would be an element of the defense.

¶ 44    Mr. Harris further testified regarding the shooting in this case. He testified that he saw Mr. Howard in Mr. Turner's vehicle and that both Mr. Washington and Mr. Humphries shouted "gun," indicating that they had seen a gun in Mr. Turner's vehicle. Mr. Harris then described how Mr. Turner was using his vehicle to attempt to cut off the red Charger. Mr. Harris believed that Mr. Turner was going to shoot at them, so he shot at him one time. Mr. Harris testified that he was afraid for his life.

¶ 45    On cross-examination, Mr. Harris acknowledged that he spoke with his trial counsel on previous court dates. Mr. Harris acknowledged that he did not tell the detectives during his interrogation that he saw Mr. Howard in the car or that he was acting in self-defense. Mr. Harris also conceded that he told the trial court that he did not wish to testify.

¶ 46    In denying the motion for a new trial, the trial court noted that Mr. Harris told the court that he had spoken with his trial counsel about plea negotiations and about whether to have a jury trial or a bench trial. The court observed that Mr. Harris also stated that he was "happy" with his trial counsel's representation. The court found that the record was therefore clear and unequivocal that Mr. Harris was satisfied with his trial counsel's representation and that there had been adequate communication. The court found that Mr. Harris never indicated that he was unhappy with his trial counsel's representation at any point during trial. The court also noted that trial counsel's representation was documented clearly in the record.

¶ 47    The trial court further observed that it had asked Mr. Harris if he wanted to testify, admonishing him that it was his choice, and not the choice of his trial counsel. Mr. Harris told the

court that he did not wish to testify. The court found with regard to the claim of self-defense that the evidence presented adequately demonstrated Mr. Turner's "behavior on the street and the ongoing conflict between various [gang] members in the vicinity." Nonetheless, the court found that given the factual circumstances of this case, Mr. Harris was asking the trier of fact to rely on "mere speculation and conjecture" to suggest that anyone in Mr. Turner's vehicle had a gun because Mr. Turner was driving the vehicle and Mr. Howard was reclined so far back in his seat that no one could see him in the vehicle. The court therefore found that trial counsel did not act unreasonably. The court also found that another attorney would not be successful in this case "given the video [of Mr. Harris' police interrogation], given the evidence that the Court has heard." The court therefore denied the motion for a new trial.

¶ 48                                E. Sentencing

¶ 49     On August 22, 2019, after hearing the arguments in mitigation and aggravation, and Mr. Harris' statement in allocution, the trial court sentenced Mr. Harris to a minimum term of 20 years imprisonment, with a mandatory 25-year firearm enhancement, for a total aggregate term of 45 years. On the same day, Mr. Harris filed his notice of appeal.

¶ 50                                II. ANALYSIS

¶ 51     We observe that we have jurisdiction to consider this matter because Mr. Harris filed a timely notice of appeal from a final judgment of the circuit court. See Ill. S. Ct. R. 606 (eff. Jul. 1, 2017).

¶ 52     On appeal, Mr. Harris contends that the trial court erred in denying his motion to suppress his custodial statement to police. He also raises numerous claims of ineffective assistance from both his trial counsel and posttrial counsel. Mr. Harris contends that his trial counsel was

ineffective in failing to argue for the suppression of his inculpatory statement to police on the additional ground that the statement was involuntary because the detectives lied to him and refused to allow him to use a phone to call his mother. Mr. Harris further contends that his trial counsel was ineffective in failing to request that the trial court consider a finding of second degree murder based on imperfect self-defense rather than adopting the "all-or-nothing" approach of solely pursuing a claim of self-defense. Mr. Harris also asserts that the trial court erred in denying his posttrial motion for a new trial where it failed to properly follow the procedures set forth in *Krankel*. In the alternative, Mr. Harris maintains that posttrial counsel was ineffective in failing to call his trial counsel as a witness at the *Krankel* hearing. Finally, Mr. Harris contends that this court should vacate two of his convictions for first degree murder based on the one-act, one-crime rule.

¶ 53                                        A. Motion to Suppress

¶ 54     We will first address Mr. Harris' contention that the trial court erred in denying his motion to suppress. "In determining whether a trial court has properly ruled on a motion to suppress, findings of fact and credibility determinations made by the trial court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence." *People v. Slater*, 228 Ill. 2d 137, 149 (2008). We review *de novo*, however, the question posed by the legal challenge to the trial court's ruling on the motion. *Id.* In reviewing the court's ruling, it is proper for us to consider the testimony adduced at trial, as well as the evidence presented at the suppression hearing. *Id.*

¶ 55     As discussed, at the suppression hearing, the State played a portion from the beginning of Mr. Harris' ERI where, after acknowledging that he understood his *Miranda* rights, he stated to

the detectives that he did not want to talk to them. After inquiry by the detectives, Mr. Harris stated that he did not want to talk to the detectives in the interrogation room because he was concerned that his co-arrestees could overhear him. After the detectives informed Mr. Harris that they had to speak in the interrogation room, Mr. Harris willingly spoke with the detectives in a quieter voice. Mr. Harris also continued to speak with the detectives after the other arrestees were removed from the neighboring interrogation rooms. In the trial transcript, the trial court judge specifically noted for the record that she placed her ear against the speaker of the television playing the ERI video so that she could adequately hear what Mr. Harris and the detectives were saying. After considering the ERI and the testimony of Detective Reiff, the court denied the motion to suppress finding that Mr. Harris did not invoke his right to remain silent, but was solely concerned about the possibility of his co-arrestees overhearing him speak with the detectives.

¶ 56    On appeal, however, Mr. Harris contends for the first time that he invoked his right to remain silent in a later part of the ERI. After Mr. Harris had been talking to the detectives for some time, but before he made an inculpatory statement, Mr. Harris told the detectives that he was "done talking." Mr. Harris maintains that this was a clear and unequivocal invocation of his right to remain silent. Mr. Harris asserts that after he made this clear and unequivocal invocation, the detectives nevertheless continued to question him and Mr. Harris eventually made the inculpatory statement. Mr. Harris maintains that this second invocation of his right to remain silent was not comparable to the previous invocation that was the subject of the motion to suppress because at the time Mr. Harris made the second invocation, he knew that his co-arrestees were no longer in the adjacent interrogation rooms so he would not have been concerned about them potentially overhearing him.

- 19 -

¶ 57    As an initial matter, we observe that this argument, based on the second invocation, was never raised before the trial court. Mr. Harris' entire ERI video was submitted into evidence at trial, but only portions were submitted at the motion to suppress. We recognize that we may *affirm* a ruling on a motion to suppress on any ground appearing in the record (*People v. Johnson*, 208 Ill. 2d 118, 132 (2003)); however, it is improper to *reverse* such rulings based on new matters or arguments presented for the first time on appeal (see, *e.g.*, *People v. Estrada*, 394 Ill. App. 3d 611, 626 (2009)). This portion of the ERI was never presented to the trial court at the hearing on the motion to suppress or admitted into evidence until during trial when the entire ERI was admitted into evidence, and Mr. Harris never argued in the trial court that his custodial statement should be suppressed on the basis of this second alleged invocation. "It is axiomatic that arguments may not be raised for the first time on appeal." *Estrada*, 394 Ill. App. 3d at 626 (citing *People v. Thompson*, 337 Ill. App. 3d 849, 854 (2003)). Although the State presented an indeterminate portion of the ERI at the hearing on the motion to suppress over defense counsel's objection, it is clear from Detective Reiff's testimony after the fact that this portion did not include this "second invocation." It would be unwarranted for this court to find that the trial court erred based on its failure to consider evidence that was not presented to it.

¶ 58    Nonetheless, Mr. Harris contends that posttrial counsel was ineffective in failing to raise the issue of trial counsel's ineffectiveness for failing to identify the correct portion of the ERI for the trial court, and in failing to identify the correct portion of the video for the trial court during posttrial proceedings. Mr. Harris maintains that if either counsel had directed the court to this portion of the recording, the motion to suppress would have been granted. Mr. Harris asserts that his confession was "likely" the strongest piece of evidence against him and "totally undercut" his

claim of self-defense. Mr. Harris asks that this court reverse his conviction and remand to the trial court with instructions to suppress his confession.

¶ 59    Claims of ineffective assistance are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cathey*, 2012 IL 111746, ¶ 23 (citing *Strickland*, 466 U.S. at 687). More specifically, a defendant must show that counsel's performance was objectively unreasonable and that there is a " 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.*). "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35. To establish deficient performance, a defendant must show his attorney's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219 (2004) (citing *Strickland*, 466 U.S. at 687). " 'Effective assistance of counsel refers to competent, not perfect representation.' " *Evans*, 209 Ill. 2d at 219 (quoting *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984)).

¶ 60    In the context of a motion to suppress, a defendant must demonstrate that the unargued grounds for suppression were meritorious and that a reasonable probability exists that the outcome of the trial would have been different had the evidence been suppressed. *People v. Gayden*, 2020 IL 123505, ¶ 28 (citing *People v. Henderson*, 2013 IL 114040, ¶ 15). Here, Mr. Harris maintains that had posttrial counsel acted reasonably and directed the court's attention to the correct portion of the ERI or raised the issue of trial counsel's failure to introduce the correct portion of the

recording, then the court would have granted his motion to suppress and the result of his trial would have been different because his confession was the strongest evidence against him.

¶ 61    We find that Mr. Harris has failed to demonstrate that he was prejudiced by the failure of both trial counsel and posttrial counsel to direct the court to the identified portion of the ERI because Mr. Harris has failed to show that the result of the suppression hearing, and therefore his trial, would have been different.

¶ 62    First, despite Mr. Harris' assertions to the contrary, his statement to the detectives that he was "done talking" was not a clear invocation of his right to remain silent. Mr. Harris states that he is "done talking" at 18:28:41. Immediately, one of the detectives almost reflexively asks him, "Why?" This was a reasonable question under the circumstances given that Mr. Harris had been openly speaking with the detectives for some time after previously indicating that he did not want to talk because he was concerned about his co-arrestees overhearing him. In response to the detective's question regarding why he was "done talking," Mr. Harris did not state that he was invoking his right to remain silent or requesting to talk to an attorney. Instead, he said that he was "done talking" because he did not believe his co-arrestees would tell the detectives that Mr. Harris shot the gun. After detectives told him that they wanted to hear his side of the story and that he was "flipping a coin" by not giving his version of events, Mr. Harris began speaking with the detectives again, eventually making the inculpatory statement.

¶ 63    We find that these circumstances do not demonstrate that Mr. Harris unambiguously invoked his right to silence. When making a verbal invocation of the right to remain silent and end the interrogation, the demand must be specific. *People v. Diaz*, 377 Ill. App. 3d 339, 348 (2007). We find this court's decision in *People v. Kronenberger*, 2014 IL App (1st) 110231 illustrative. In

*Kronenberger*, the defendant was arrested and questioned in connection with a homicide. *Id.* ¶¶ 3-5. In a videotaped statement, the defendant acknowledged his role in the murder and related offenses. *Id.* ¶ 5. Prior to his trial, the defendant filed a motion to suppress his statement arguing, *inter alia*, that the police did not scrupulously honor his invocation of the right to remain silent or his request for an attorney. *Id.* ¶ 6. At the hearing, the defendant testified that he told the officers that he "didn't want to talk" and told another officer that he "didn't want to speak to him," but the officers continued questioning him. *Id.* ¶ 7. He testified that he told several officers that he "didn't want to talk to them" by saying that he "was done." *Id.* ¶ 8. The trial court denied the defendant's motion to suppress after hearing testimony from one of the detectives and reviewing the defendant's videotaped statement. *Id.* ¶ 10.

¶ 64    On appeal, the defendant contended that his videotaped statement should have been suppressed where the detectives failed to scrupulously honor his invocation of the right to remain silent. *Id.* ¶ 31. This court reviewed the defendant's videotaped interrogation noting that the defendant identified two portions of the videotape where he alleged that he invoked his right to remain silent. *Id.* In the first portion, the detective asked the defendant: "You don't want to talk to me anymore?" and "We done talking?" *Id.* ¶ 34. The defendant alleged that in response to these questions, he invoked his right to remain silent by shaking and nodding his head. *Id.* ¶ 35. The court rejected this contention finding that the defendant made only "very slight" movements that did not rise to the level of an unambiguous and unequivocal invocation of the right to remain silent. *Id.*

¶ 65    In the second portion of the defendant's videotaped statement, the detective asked him: "Are you done talking to me? Are you done talking to all of us?" The defendant responded,

"Yeah." *Id.* ¶ 36. In response, the detective asked the defendant why he was being a "p***" and told him that this was his chance to "flip the script." *Id.* The court found that this interaction did not demonstrate that the defendant unambiguously invoked his right to remain silent. *Id.* ¶ 37. The court reasoned that after having spoken to the detective for 14 minutes, the defendant may have simply been indicating that he had nothing else to tell the detectives. *Id.* The court concluded that "the defendant's response, without specificity, did not indicate a desire to end all questioning so as to rise to the level of an unambiguous and unequivocal invocation of the right to silence."[3] *Id.*

¶ 66    We find the same analysis applies in this case where Mr. Harris' statement, without specificity, did not indicate a desire to end all questioning so as to rise to the level of an unambiguous and unequivocal invocation of the right to silence. Similar to the defendant in *Kronenberger*, Mr. Harris had been speaking with the detectives for some time, with the detectives leaving the room multiple times for long periods and returning striking up new conversations. Mr. Harris' statement that he was "done talking" may have meant that he was done with that particular conversation as Mr. Harris had been speaking to the detectives for more than 20 minutes straight at the time that he made the statement. See *Id.* ¶ 37 ("It is unclear from the defendant's response whether he wished to invoke his constitutional right to silence or whether he, after having spoken

---

[3]We find the additional authority collected by the *Kronenberger* court persuasive even if not precisely analogous to the circumstances in this case:

> "See *People v. Smith*, 152 Ill. 2d 229, 255-56 (1992) (defendant's statement of " 'leave me alone' " was not an invocation of right to silence); *People v. Aldridge*, 68 Ill. App. 3d 181, 186-88 (1979) (defendant's statements to police that " 'you've got enough details right now that fits the crime so let's hang this up,' " " 'you've got everything you need here now,' " and " 'there's nothing I want to add to it,' " were not invocation of right to silence but rather a reluctance to convey to the police the details of the offense), aff'd, 79 Ill. 2d 87, (1980); *People v. Pierce*, 223 Ill. App. 3d 423, 429-30 (1991) (no invocation of right to silence triggered where defendant stated, " 'You've got all the stuff there right now. You don't need no more really' ")." *Id.* ¶ 37.

to Detective Brogan in the earlier 14-minute conversation, had nothing else to tell the detectives."). When the detectives gave Mr. Harris an opportunity to explain his statement that he was done talking by asking him "Why," Mr. Harris did not unambiguously invoke his right to remain silent despite the prompt.

¶ 67    Accordingly, we find that Mr. Harris has failed to demonstrate that if either posttrial counsel or trial counsel had directed the court to the indicated part of the ERI that the motion to suppress would have been granted.

¶ 68    Briefly, we find that even if Mr. Harris had been successful in seeking the suppression of his inculpatory statement, he has failed to demonstrate that the result of his trial would have been different. Mr. Stokes testified that he saw Mr. Harris fire the gun at Mr. Turner's vehicle and testified that he did not see Mr. Turner with a gun or see anyone else in Mr. Turner's vehicle. It is well-settled that "[t]he testimony of a single witness[] is sufficient to convict if the testimony is positive and the witness is credible." *People v. Bannister*, 378 Ill. App. 3d 19, 39 (2007) (citing *People v. Smith*, 185 Ill. 2d 532, 541 (1999)). Mr. Harris maintains that Mr. Stokes' testimony was questionable, however, given his contradictory statements to police during his interrogation. However, the trial court's ruling indicates that it found Mr. Stokes credible. We recognize that it is the responsibility of the trier of fact to determine the credibility of the witnesses and the weight to be given their testimony, to resolve any conflicts and inconsistencies in the evidence, and to draw reasonable inferences therefrom. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

¶ 69    The court's ruling suggests that it accepted Mr. Stokes' version of the events and rejected the version presented by defense witnesses, particularly Mr. Washington. The court found that no one inside of Dodge Charger could see Mr. Howard because his seat was reclined so far back. This

finding was corroborated by the testimony of Officer Miles who observed that passenger seat in Mr. Turner's vehicle was tilted back, "past the door frame for the front and back of the car." The court's finding that Mr. Howard was not visible outside of the vehicle represents an implicit rejection of Mr. Washington's testimony that he saw Mr. Howard draw a gun and that he shouted "gun." The court also specifically stated that it relied on Mr. Stokes' testimony about where Mr. Harris was sitting in the vehicle, which was corroborated by Officer Alaniz. According to Mr. Stokes' version of the events, Mr. Turner was driving in an aggressive manner and Mr. Harris responded by shooting a gun at the vehicle, killing Mr. Howard. No one in the red Dodge Charger saw Mr. Turner or anyone else in Mr. Turner's vehicle with a gun. Mr. Stokes also acknowledged that he testified before a grand jury that Mr. Harris asked to be the one to shoot Mr. Turner. This demonstrates Mr. Harris' commission of the charged offense and defeats his claim of self-defense. Accordingly, we find that Mr. Harris has failed to carry his burden on his claim of ineffective assistance of posttrial counsel because he has failed to demonstrate that the result of his trial would have been different if the motion to suppress had been granted. *Gayden*, 2020 IL 123505, ¶ 28.

¶ 70                                    B. Involuntary Confession

¶ 71     Mr. Harris next contends that his posttrial counsel was ineffective in failing to raise the issue of trial counsel's ineffectiveness in failing to challenge the admission of his custodial statement on the grounds that it was involuntary. Mr. Harris maintains that if his trial counsel included this claim in the motion to suppress, the motion would have been granted because, during the interrogation, the detectives lied to him about the results of the gun shot residue test, refused to inform him of the nature of the charges against him, and denied him his right to a phone call

with his mother. Mr. Harris asserts that if the motion to suppress had been granted, there is a reasonable probability that the result of his trial would have been different.

¶ 72    As noted, we use the standards set forth in *Strickland* in determining whether counsel's performance was deficient and whether that deficient performance prejudiced the defendant. *Cathey*, 2012 IL 111746, ¶ 23 (citing *Strickland*, 466 U.S. at 687). " 'The test for voluntariness of a statement is whether the individual made the statement freely, voluntarily, and without compulsion or inducement of any kind, or whether the individual's will was overcome at the time of the confession.' " *People v. Hughes*, 2015 IL 117242, ¶ 31 (quoting *People v. Morgan*, 197 Ill. 2d 404, 437 (2001)). A confession is deemed voluntary "if it is the product of free will, rather than the inherently coercive atmosphere of the police station." *People v. Nicholas*, 218 Ill. 2d 104, 118 (2005). In determining whether the defendant's confession was voluntary, this court looks to the totality of the circumstances, including: "(1) the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; (2) the duration of the interrogation; (3) the presence of *Miranda* warnings; (4) the presence of any physical or mental abuse; and (5) the legality and duration of the detention." *Slater*, 228 Ill. 2d at 160.

¶ 73    As discussed, Mr. Harris cannot meet his burden on this claim because he has failed to demonstrate that the result of his trial would have been different if his inculpatory statement had been suppressed. See *Henderson*, 2013 IL 114040, ¶ 12. Nonetheless, we will address Mr. Harris' contention that his trial counsel should have sought to suppress his statement on the grounds that it was involuntary.

¶ 74    First, we observe that whether to file a motion to suppress and what claims to include in the motion are generally matters of trial strategy that are generally immune from claims of

ineffective assistance of counsel. *People v. Martinez*, 348 Ill. App. 3d 521, 537 (2004). As such, we accord counsel's decision great deference. *Id.*

¶ 75    Mr. Harris maintains that his trial counsel should have challenged the admission of his confession on the grounds that it was involuntary because the police lied to him about the results of the gun shot residue test, did not apprise him of the nature of the charges, and refused to allow him to use a phone to call his mother.

¶ 76    We recognize that police deception is not *per se* unlawful, but it can contribute to the coerciveness of the interrogation and weigh against a finding of voluntariness. *People v. Patterson*, 2014 IL 115102, ¶ 76. Detective Reiff acknowledged that he told Mr. Harris during the interrogation that the gun shot residue tests results would show that he fired a gun, but Detective Reiff did not know what the tests results would show at that time. As the parties stipulated at trial, the gun shot residue testing did not show any residue on Mr. Harris' clothes or person. We also observe that shortly after entering the interrogation room, one of the detectives told Mr. Harris that he was "accused of being involved in a shooting." Detective Reiff testified, however, that he lied about the fact that he did not know whether Mr. Howard was dead at the time he was interrogating Mr. Harris. This deception on the part of the detectives would therefore weigh in favor of finding Mr. Harris' confession involuntary.

¶ 77    However, as noted, this court and the supreme court have recognized various other factors that the court can consider in assessing the voluntariness of a confession. Some of the factors include the defendant's age, experience, educational background, intelligence (*People v. Murdock*, 2012 IL 112362, ¶ 44), the duration of the interrogation, whether the defendant was informed of his constitutional rights, whether the defendant was subjected to physical punishment, offers of

leniency or other promises (*In re L.L.*, 295 Ill. App. 3d 594, 600 (1998)), the defendant's physical condition at the time of questioning, and the time of day when the questioning occurred (*People v. Griffin*, 327 Ill. App. 3d 538, 545 (2002)). Considering the totality of the circumstances, and recognizing the police deception identified by Mr. Harris, we cannot say that Mr. Harris' confession was involuntary.

¶ 78    Mr. Harris was 25 years old at the time of his arrest. Mr. Harris maintains that he had trouble reading and potentially had a learning disability, but his presentence investigation report indicates that he is a high school graduate. Mr. Harris was advised of his *Miranda* warnings and indicated that he understood them. The interrogation in this case was also not unduly long, nor did it occur at an unreasonable time of day. Mr. Harris was placed in the interrogation room around 3:30 p.m. The detectives entered the room and began speaking to Mr. Harris and swabbing him for testing around 4:06 p.m. Over the next few hours, the detectives had various conversations with Mr. Harris lasting between 15 and 45 minutes, and Mr. Harris made the incriminating statement shortly before 8 p.m. There was also no suggestion of physical force or coercion, Mr. Harris had not been injured and appeared to have a normal physical condition, and the officers did not make him any promises of leniency. These factors all support a finding that his confession was voluntary.

¶ 79    Nonetheless, Mr. Harris maintains that his confession was involuntary because the detectives refused to allow him a phone call to call his mother. Mr. Harris asserts section 103-3(a)

of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-3(a) (West 2014)[4] provides that he had the "right to communicate" by phone with family members. That section provides that:

> "Persons who are arrested shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner. Such communication shall be permitted within a reasonable time after arrival at the first place of custody." *Id.*

¶ 80    A review of Mr. Harris' ERI shows that he first requested to call his mother at approximately 7:30 p.m. Mr. Harris told the detectives that he "just wanted to talk to her" for 10 or 20 seconds. The detectives informed Mr. Harris that they did not let people make phone calls in this situation. Mr. Harris stated that he wanted to talk to someone who would make him "feel better about the situation." The detectives told Mr. Harris that he would get a phone call later, and Mr. Harris responded that he hoped so because he was not sure that his mother knew that he had been arrested and did not want her looking for him. Mr. Harris made the incriminating statement approximately 30 minutes later.

¶ 81    The supreme court recently addressed an accused's right to communicate with family members in *People v. Salamon*, 2022 IL 125722, and we granted Mr. Harris' motion to cite additional authority to address the *Salamon* case. In *Salamon*, the defendant was arrested and placed in an interrogation room. *Id.* ¶ 9. Both before and after being read his *Miranda* rights, the defendant asked to speak to a lawyer. *Id.* The officers did not permit the defendant to use a phone to contact an attorney or any members of his family to arrange for counsel. *Id.* The defendant was

---

[4]We note section 103-3 has since been repealed (see Pub. Act 102-694, § 25 (eff. Jan. 7, 2022)), and the rights of an accused to communicate with family members and an attorney is currently set forth in section 103-3.5 of the Code of Criminal Procedure (725 ILCS 5/103-3.5 (West 2022)).

handcuffed to the wall in the interrogation room and held there overnight. *Id.* ¶ 10. The defendant repeatedly requested a telephone call so that he could contact an attorney, but none of the officers permitted him to use the telephone. *Id.* ¶ 11. The defendant also requested a phone to call his mother so that she could call a lawyer. *Id.* When a police officer entered the interrogation room approximately 24 hours later, the defendant stated that he wanted to talk to the detectives. *Id.* The detective came into the room, but told the defendant he would have to wait to use the phone. *Id.* The defendant reinitiated contact with the detectives, was again advised of his *Miranda* rights, and then made an incriminating statement. *Id.* ¶ 12.

¶ 82    A detective testified at the defendant's suppression hearing that it was " 'procedure' " to not allow arrestees telephone access until " 'after the completion of the booking process." *Id.* ¶ 15. The detective testified that the defendant was not booked until after he provided the incriminating statement. *Id.* The circuit court denied the defendant's motion to suppress finding that he was advised of his *Miranda* rights and waived those right when he reinitiated contact with the detectives. *Id.* ¶ 23.

¶ 83    On appeal to the supreme court, the court recognized that Illinois arrestees have a statutory right to communicate with family and counsel. *Id.* ¶¶ 91-92. The court explained that the purpose of section 103-3(a) is to "allow a person being held in custody to contact family members to arrange for 'bail, representation by counsel and other procedural safeguards that the defendant cannot accomplish for himself while in custody.' " *Id.* ¶ 92 (quoting *People v. Prim*, 53 Ill. 2d 69-70 (1972)). The court found that a violation of section 103-3(a) is one of the factors to be considered in a totality-of-the-circumstances test in determining whether a suspect's inculpatory statement is involuntary. *Id.* ¶ 94. The court noted that the statute provided that the suspect should

be allowed access to a telephone " 'within a reasonable time,' " which indicates that the length and duration of custody prior to telephone access must be viewed together. *Id.* The court found that "a reasonable time" is a "relatively short period of time—such as a couple hours." *Id.* ¶ 99. The court emphasized that although a violation of section 103-3(a) does not automatically render a confession or inculpatory statement inadmissible, it is "an essential factor in the totality-of-the-circumstance calculus." *Id.* ¶ 104. The court found that the detectives violated section 103-3(a) based on the length of the defendant's detention and the fact that the detectives denied his repeated requests for telephone access. *Id.* ¶ 102. The court stated that:

> "Those two factors, considered together, demonstrate that defendant was held *incommunicado* for approximately 24 hours with no means of contacting an attorney or a family member to arrange for counsel. By denying defendant telephone access, the detectives resolutely prevented him from exercising his constitutional right to counsel—a right that he consistently invoked from the moment of his arrest until he ultimately made the inculpatory statement 24 hours later." *Id.*

¶ 84    The supreme court's ruling in *Salamon* makes clear that the primary concern of section 103-3(a) was to ensure that an arrestee had the opportunity to use a phone to contact counsel or to contact a family member to arrange for counsel, bail, or other procedural safeguards. Mr. Harris does not allege that he asked for a phone to call an attorney or to contact his mother so that she could contact an attorney on his behalf. Detective Reiff testified that Mr. Harris never asked for an attorney and told the detectives that the reason he wanted to call his mother was because he wanted her to be aware that he was locked up, and the ERI corroborates that testimony. Detective Reiff further testified that they did not permit suspects to make phone calls because it could lead

to "problems in the investigation" such as allowing suspects to "create alibis for themselves." Mr. Harris encourages an interpretation of section 103-3(a) that would permit an arrestee to make a phone call to a family member for any reason at any time after being arrested. That is simply not what the statute provides.

¶ 85    We find this court's ruling in *People v. Williams*, 2017 IL App (1st) 142733 instructive. In *Williams*, the defendant alleged that his custodial statements to police were not freely and rationally given based on the detectives' refusal to allow him to make a phone call and his " 'physical, mental, and psychological state." *Id.* ¶ 9. A detective testified at the defendant's suppression hearing that the defendant requested to make a phone call after being advised of his *Miranda* rights. *Id.* The defendant made a second request about an hour later. *Id.* Both requests were denied, but the detective told the defendant he could make a phone call when he went to the lockup. *Id.* The defendant requested to make a phone call several more times, but each request was denied. *Id.* ¶¶ 9-10. The defendant told the officers that his son had been born after a complicated delivery and was undergoing testing *Id.* ¶ 10. He told the officers he would comply with their investigation, but he wanted to make a phone call to make sure his son was okay. *Id.* The defendant made inculpatory statements to both the detectives and an assistant State's Attorney. *Id.* ¶¶ 11-12. The defendant later invoked his right to counsel. *Id.* ¶ 12. The circuit court denied the defendant's motion to suppress the statements that he made before he invoked his right to counsel. *Id.* ¶ 13.

¶ 86    On appeal, the defendant contended that the court erred in denying his motion to suppress the statements he made prior to his invocation of his right to counsel where the officers failed to comply with section 103-3 by denying him his right to make a phone call. *Id.* ¶ 26. The court found that the totality of the circumstances demonstrated that the defendant's unsuppressed statements

were voluntarily given despite the denial of his requests to make a phone call. *Id.* ¶ 30. The court noted that the defendant wanted to make a phone call to check on the status of his newborn son, but did not initially inform the detectives of this fact. *Id.* ¶¶ 30-31. The court recognized that the purpose of section 103-3 is to " 'permit a person held in custody to notify his family of his whereabouts and to notify them of the nature of the offense with which he is charged so that arrangements may be made for bail, representation by counsel and other procedural safeguards that the defendant cannot accomplish for himself while in custody.' " *Id.* ¶ 35 (quoting *Prim*, 53 Ill. 2d at 69-70). The court observed that the defendant never stated the purpose of the phone call was to request an attorney or to inform his family of his location so that they could provide an attorney. *Id.* The court also determined that the defendant did not "fit the profile of an adult in need of familial assistance while in police custody." *Id.* ¶ 35. The court concluded that the defendant's rights under section 103-3 were not violated where "the purpose of the statute is to ensure access to counsel and other procedural safe guards [*sic*] while in custody." *Id.*

¶ 87    Like the defendant in *Williams*, Mr. Harris here did not tell the police officers that he wanted to use the phone to contact counsel or to contact a family member so that they could arrange counsel on his behalf. Instead, he stated that he wanted to speak to his mother so that she could make him feel better about the situation and to tell her that he was locked up. Mr. Harris also does not "fit the profile of an adult in need of familial assistance while in police custody." *Id.* ¶ 35. Mr. Harris asserts that *Williams* was wrongly decided and reads limitations into the section 103-3(a) that are not contemplated by the terms of the statute. The *Williams* court's interpretation of section 103-3(a), however, is expressly supported by the supreme court's decision in *Prim*, which the court recently reaffirmed in *Salamon*.

¶ 88    We must also view the detective's refusal of Mr. Harris' requests to call his mother in the context of the totality of the circumstances. Mr. Harris was in custody for less than five hours before making an incriminating statement. The court in *Williams* found that a similar length of detention was not a factor in favor of involuntariness. *Id.* ¶ 32. Combined with the other factors discussed above, including Mr. Harris' age, the lack of physical or mental coercion, and the duration and time of day of the questioning, we cannot say that the detectives' refusal to permit Mr. Harris a phone call rendered his statement involuntary under the circumstances. We therefore find that Mr. Harris has failed to demonstrate that his trial counsel rendered ineffective assistance in failing to challenge the admissibility of his custodial statement on the grounds that the statement was involuntary. For the same reasons, we also reject Mr. Harris' contention that posttrial counsel was ineffective in failing to raise the issue of trial counsel's ineffectiveness in failing to seek to suppress Mr. Harris' statement on the grounds that it was involuntary.

¶ 89                                    C. Second Degree Murder

¶ 90    Mr. Harris next asserts that his trial counsel was ineffective in failing to ask the trial court to consider second degree murder based on imperfect self-defense as a lesser mitigated offense. Mr. Harris contends that the court heard evidence of Mr. Turner's violent nature and Mr. Harris told police that Mr. Turner was driving aggressively and Mr. Harris believed Mr. Turner was going to start shooting at them. Mr. Harris maintains that it is trial counsel's responsibility to ask the court to consider the lesser mitigated offense of second degree murder, and counsel's failure to do so amounted to deficient performance.

¶ 91    Mr. Harris is correct that a criminal defendant who elects a *jury trial* has the right to decide whether to tender a lesser-included offense jury instruction. *People v. Brocksmith*, 162 Ill. 2d 224,

229-30 (1994). This court has repeatedly found, however, that the same considerations do not apply where a defendant elects a bench trial. See, *e.g.*, *People v. Walton*, 378 Ill. App. 3d 580, 587-89; *People v Spiller*, 2016 IL App (1st) 133389, ¶¶ 38-41. The rationale behind this distinction is that a jury does not have the option to convict a defendant of an uncharged lesser-included offense unless an instruction is tendered. *Walton*, 378 Ill. App. 3d at 588. "In contrast, a judge presiding over a bench trial may convict a criminal defendant of an uncharged lesser-included offense *sua sponte*." *Id.* (citing *People v. Moore*, 358 Ill. App. 3d 683, 690 (2005)).

¶ 92    Accordingly, this court has routinely rejected contentions that trial counsel was ineffective in failing to ask the trial court in a bench trial for first degree murder to consider the lesser mitigated offense of second degree murder. Courts addressing these contentions generally reject them for failing to satisfy either prong of the *Strickland* standard. First, they recognize that trial counsel's decision to pursue an "all or nothing defense" is recognized as valid trial strategy. *Spiller*, 2016 IL App (1st) 133389, ¶ 39; *Walton*, 378 Ill. App. 3d at 589 ("Counsel's decision to advance an 'all-or-nothing defense' has been recognized as a valid trial strategy [citations] and is generally not unreasonable unless that strategy is based upon counsel's misapprehension of the law."). The fact that counsel's strategy ultimately proved unsuccessful does not mean that counsel's performance was unreasonable. *Walton*, 378 Ill. App. 3d at 589. "Moreover, counsel cannot be found ineffective for failing to request that the trial court consider second degree murder, as the trial court was empowered to consider this lesser offense regardless of counsel's arguments." *Spiller*, 2016 IL App (1st) 133389, ¶ 40.

¶ 93    In addition, Mr. Harris, like the defendants in *Walton* and *Spiller*, cannot show that he suffered prejudice by trial counsel's allegedly deficient performance. *Walton*, 378 Ill. App. 3d at

589; *Spiller*, 2016 IL App (1st) 133389, ¶ 41. The trial court's ruling in this case is clear that it considered whether Mr. Harris acted reasonably or unreasonably in self-defense. The court observed that the defense elicited testimony about Mr. Turner's violent nature and that there had been some "suggestion that this was in self-defense or in some way based on the aggressive nature of Mr. Turner." The court, however, rejected that contention. Therefore, Mr. Harris has failed to demonstrate that there is a reasonable probability that if his trial counsel had argued in favor of a second degree murder conviction that the result of his trial would have been different. See *Spiller*, 2016 IL App (1st) 133389, ¶ 41. Accordingly, we find that Mr. Harris has failed to demonstrate that his trial counsel was ineffective in failing to ask the court to consider the lesser mitigated offense of second degree murder.

¶ 94                              D. Motion for New Trial

¶ 95    Mr. Harris next claims that the trial court erred in denying his motion for a new trial where the court failed to properly follow the procedures set forth in *Krankel*. Mr. Harris asserts that the claims of ineffective assistance that he raised in his motion for a new trial could only be resolved by bringing in his trial counsel to testify because they involved matters occurring outside of the record, such as trial counsel's failure to consult with him. In the alternative, Mr. Harris maintains that posttrial counsel was ineffective in failing to call trial counsel as a witness at the hearing.

¶ 96    We first must address our standard of review on this issue. Mr. Harris frames this issue as one of an improper *Krankel* hearing, and the State responds arguing that the court correctly followed the procedure of *Krankel*. However, "[t]he common law procedure developed from our decision in *Krankel* is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel." *People v. Jolly*, 2014 IL 117142, ¶ 29 (citing *Krankel*, 102 Ill. 2d 181).

After the defendant raises his *pro se* claims, the trial court is obligated to examine the factual basis of the defendant's claims to determine whether they lack merit or pertain only to matters of trial strategy. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). If the trial court determines, however, that the defendant's claims show possible neglect of the case, new counsel should be appointed to represent the defendant at a hearing on the defendant's *pro se* claims. *Id.* at 78.

¶ 97     In this case, the court did not address Mr. Harris' *pro se* claims of ineffective assistance of trial counsel in a preliminary *Krankel* inquiry before appointing counsel to represent him at a *Krankel* hearing. It is clear from the record that the claims of ineffective assistance that were raised in the motion for a new trial were based on defendant's *pro se* allegations. After Mr. Harris' trial counsel was disbarred from the practice of law, new counsel entered an appearance to represent him. Mr. Harris' new counsel, however, requested leave to withdraw based on a conflict of interest. The new counsel informed the court that she was seeking leave to withdraw because "Mr. Harris is asking for a *Krankel* hearing" and she had a "conflict" with Mr. Harris' trial counsel. The court permitted Mr. Harris' new counsel to withdraw and appointed a public defender to represent him. The public defender then filed an amended motion for a new trial that included allegations of ineffective assistance of trial counsel that were presumably based on Mr. Harris' *pro se* allegations. The court then proceeded to a hearing on the motion where Mr. Harris took the stand and answered questions from his counsel about his claims of ineffective assistance and was cross-examined by the State.

¶ 98     Essentially, the trial court skipped the first portion of the *Krankel* procedure, a preliminary inquiry into the defendant's *pro se* claims of ineffective assistance (See *Jolly*, 2014 IL 117142, ¶ 30), and proceeded directly into the second portion, the appointment of counsel to represent the

defendant at a hearing on his claims (*Moore*, 207 Ill. 2d at 77-78). This court has found that this procedure is a violation of *Krankel*. As this court has explained, where a defendant has made *pro se* claims of ineffective assistance of counsel, "[a]llowing trial counsel to withdraw and appointing new posttrial defense counsel does not satisfy *Krankel* procedure." *People v. Reed*, 2018 IL App (1st) 160609, ¶ 51. Rather, "the law require[s] some type of inquiry into the underlying factual basis of the defendant's *pro se* claim." *People v. Palomera*, 2022 IL App (2d) 200631, ¶ 60 (citing *Reed*, 2018 IL App (1st) 160609, ¶ 51. As discussed, the court in this case did not conduct any type of inquiry into Mr. Harris' *pro se* claims, and, indeed, Mr. Harris never made any such *pro se* claims on the record.

¶ 99      Nonetheless, we find the court's failure to comply with *Krankel* procedure in this case is harmless error where Mr. Harris' allegations of ineffective assistance were presented in the motion for new trial filed by posttrial counsel and where Mr. Harris was permitted to testify regarding his claims. See *Palomera*, 2022 IL App (2d) 200631, ¶¶ 63-64 (finding that the trial court's failure to conduct a preliminary *Krankel* inquiry was harmless error where the defendant's claims of ineffective assistance of trial counsel were either raised in a motion for a new trial and rejected by the trial court or were positively rebutted by the record). While we agree with the reasoning in *Palomera* that the court's error was harmless, we reiterate the admonishment in that case that the "better course is for the trial court to conduct a preliminary inquiry and to make it clear from the record that it considered the defendant's claims." *Id.* ¶ 64.

¶ 100   We next address Mr. Harris' contention that the court erred in conducting the *Krankel* hearing where it did not bring in Mr. Harris' trial counsel to respond to Mr. Harris' claims.[5] Mr. Harris maintains that his claims of ineffective assistance of trial counsel were based on matters outside of the record that could only be resolved with some inquiry of trial counsel.

¶ 101   Our standard of review on appeal from a *Krankel* inquiry depends on whether defendant challenges the procedure employed by the trial court or whether the defendant challenges the trial court's ultimate ruling on the merits. "Whether the trial court properly conducted a *Krankel* preliminary inquiry presents a legal question that we review *de novo*. *People v. Roddis*, 2020 IL 124352, ¶ 33. However, if the trial court has properly conducted a *Krankel* inquiry and has reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial court's action was manifestly erroneous. *People v. Jackson*, 2020 IL 124112, ¶ 98. Here, Mr. Harris challenges the procedure employed by the court in evaluating his claims of ineffective assistance maintaining that the court could not properly evaluate his claims without inquiring with his trial counsel. Accordingly, we review the trial court's procedure *de novo*.

¶ 102   In the amended posttrial motion, posttrial counsel asserted that trial counsel was ineffective in, *inter alia*, failing to meaningfully discuss trial strategy and procedure with Mr. Harris. posttrial counsel alleged that trial counsel met with Mr. Harris only one time at the jail, two days before the defense rested its case. Posttrial counsel acknowledged that trial counsel may have met with Mr. Harris in the lockup area[6] on court dates, but maintained that the lockup environment did not

---

[5]We observe that before the State cross-examined Mr. Harris at the hearing on the motion for a new trial, the State informed the court that it may be necessary to bring in Mr. Harris' trial counsel. The court responded: "Right. Okay. Good luck."

[6]The lockup area is a jail or holding area where defendants are held in custody until their case is called. Attorneys for the defendants are permitted to go to the lockup area to speak with their client before or after a case is called.

permit an opportunity for meaningful discussion about trial counsel's strategy or the evidence. Posttrial counsel further asserted that trial counsel failed to discuss the standard for self-defense with Mr. Harris and failed to permit him an opportunity to review the relevant evidence, including the ERI video. Posttrial counsel also contended that trial counsel was ineffective at the hearing on the motion to suppress because he did not allow Mr. Harris to testify to rebut the testimony of Detective Reiff. Mr. Harris maintains that these claims, particularly those which alleged that trial counsel failed to consult with him and only met with him a single time, are based on facts occurring outside of the record and the trial court could only have resolved them through some interchange with trial counsel.

¶ 103   We recognize that the supreme court has explained that under *Krankel* "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Moore*, 207 Ill. 2d at 78. In this case, it is clear that no such interchange took place. Our supreme court has recognized, however, that the trial court may evaluate a defendant's allegations of ineffective assistance after only a brief discussion with the defendant. *Id.* The court can also base its evaluation of the defendant's claims on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face without questioning trial counsel. *Id.* In this case, it is clear that the trial court rejected Mr. Harris' claims of ineffective assistance of trial counsel based on the insufficiency of his allegations and the court's knowledge of trial counsel's performance at trial.

¶ 104   In denying Mr. Harris' motion, the trial court found that Mr. Harris had acknowledged before trial that he had spoken with his trial counsel about whether to elect a jury trial or a bench

trial and had spoken with his counsel about plea negotiations. The court further noted that Mr. Harris stated that he was "happy" with his counsel's representation. The court therefore found that the record demonstrated that there had been adequate communication between trial counsel and Mr. Harris, and trial counsel's competent representation of Mr. Harris was documented in the record.

¶ 105   The trial court, having presided over the entire trial, reviewed the evidence, its notes, and the transcripts, was in a position to determine whether trial counsel's performance was deficient without specifically questioning trial counsel about Mr. Harris' allegations. See *People v. Coleman*, 158 Ill. 2d 319, 351 (1994). The court also heard testimony from Mr. Harris regarding his interactions and discussions with trial counsel, which allowed the trial court to gather sufficient information that the attorney-client communication between trial counsel and Mr. Harris was adequate. If the court found that based on the motion and Mr. Harris' testimony that it needed more information, particularly in the form of trial counsel's testimony, it could have ordered trial counsel to testify. However, the court's ruling suggests that it had adequate information from the evidence and arguments presented to rule on Mr. Harris' claims, and the record supports the court's determination where Mr. Harris' assertions are belied by the record or relate to matters solely of trial strategy.

¶ 106   First, Mr. Harris' allegations regarding trial counsel's approach to presenting Mr. Harris' claim of self-defense are allegations which clearly relate to trial strategy. Although Mr. Harris couches his claims in different terms, the essence of his claims is that he was unhappy with trial counsel's chosen strategy and he was unhappy with how trial counsel chose to present that strategy. Generally, however, counsel's choice as to which theory of defense to present and the manner in

which to question witnesses constitute matters of trial strategy. *People v. Campbell*, 264 Ill. App. 3d 712, 732-33 (1992). Allegations relating to trial strategy cannot serve as the basis of a *Krankel* claim. *Jackson*, 2020 IL 124112, ¶ 106 (citing *People v. Chapman*, 194 Ill. 2d 186, 230-31 (2000); *People v. Kidd*, 175 Ill. 2d 1, 44-45 (1996)). "Whether to call certain witnesses and whether to present an alibi defense are matters of trial strategy, generally reserved to the discretion of trial counsel." *Kidd*, 175 Ill. 2d at 45. Claims of errors in trial strategy constitute ineffective assistance only where counsel fails to conduct any meaningful adversarial testing of the State's case. *People v. Perry*, 224 Ill. 2d 312, 355-56 (2007) (citing *People v. West*, 187 Ill. 2d 418, 432-33 (1999)). Mr. Harris does not assert that counsel failed to do so and the record demonstrates that trial counsel adequately cross-examined the State's witnesses and sufficiently presented his chosen claim of self-defense such that we cannot say that he failed to conduct any meaningful adversarial testing.

¶ 107   Furthermore, Mr. Harris' claims concerning his communication with trial counsel and his desire to testify are belied by the record. Prior to trial, the court asked Mr. Harris if he was aware that trial counsel was setting his case for a bench trial. The court asked Mr. Harris if he had spoken to his trial counsel "in regards to jury trial, bench trial and possibly any plea negotiations." Mr. Harris responded, "Yes." The court also asked Mr. Harris if he talked to his trial counsel about any "additional witnesses" to call and Mr. Harris responded, "Yes." Mr. Harris also stated that he was ready to go to trial, and, in response to the question of whether he was "happy" with his trial counsel's representation, Mr. Harris responded, "Yes."

¶ 108   The court similarly discussed with Mr. Harris his right to testify. Before the defense presented its witnesses, the court asked trial counsel whether Mr. Harris would testify. Trial counsel told the court that he was "not sure yet." Later, when trial counsel informed the court that

Mr. Harris would not be testifying, the court admonished Mr. Harris regarding his right to testify at length:

> "THE COURT: Mr. Harris, sir, you have the right to testify, sir, do you understand that?
>
> MR. HARRIS: Yes.
>
> THE COURT: And it's your right and your right alone, do you understand that?
>
> MR. HARRIS: Yes, ma'am.
>
> THE COURT: [Trial counsel] can [] give you his opinion, his expertise, but the decision is yours, sir, do you understand that?
>
> MR. HARRIS: Yes ma'am.
>
> THE COURT: Do you with [*sic*] to testify?
>
> MR. HARRIS: No."

¶ 109 The record thus shows that Mr. Harris confirmed that he was happy with his trial counsel's representation, had discussed with his trial counsel regarding whether to elect a bench or jury trial, had spoken with trial counsel regarding any plea negotiations, and knowingly and voluntarily waived his right to testify. Mr. Harris does not assert that trial counsel refused to allow him to testify, and trial counsel's advice to not testify and decision to not call Mr. Harris as a witness constitutes trial strategy, which does not support a claim of ineffective assistance. *People v. Hernandez*, 2014 IL App (2d) 131082, ¶ 33 (citing *People v. Coleman*, 2011 IL App (1st) 091005, ¶ 29). Accordingly, we find that the court conducted an adequate inquiry into Mr. Harris' claims of ineffective assistance of trial counsel and did not err in denying his motion for a new trial. For

the same reasons, we find that Mr. Harris has failed to demonstrate that posttrial counsel was ineffective in failing to call trial counsel as a witness at the hearing on the motion for a new trial.

¶ 110                                        E. One-Act, One-Crime

¶ 111   Mr. Harris finally contends that we should vacate two of his convictions for first degree murder based on the one-act, one-crime rule. Mr. Harris points out that he was found guilty of three counts of first degree murder, but all three counts were based on the same act of Mr. Harris firing a gun and killing Mr. Howard. The State concedes that Mr. Harris' conviction and sentencing on three counts of first degree murder for the same act violates the one-act, one-crime rule. We agree.

¶ 112   Under the one-act, one-crime rule, a defendant may not be convicted of multiple offenses that arise from a single physical act. *People v. Nunez*, 236 Ill. 2d 488, 493-94 (2010). Although Mr. Harris failed to preserve this issue for review by raising the issue in the circuit court, our supreme court has recognized that violations of the one-act, one-crime doctrine are reviewable under the second prong of the plain error doctrine. *People v. Coats*, 2018 IL 121926, ¶ 10; *Nunez*, 236 Ill. 2d at 493. The plain error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances. *People v. Averett*, 237 Ill. 2d 1, 18 (2010). Second prong plain error occurs where the alleged error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). We review alleged violations of the one-act, one-crime doctrine *de novo*. *Nunez*, 236 Ill. 2d at 493.

¶ 113   Here, the trial court found Mr. Harris guilty of counts I, XII, and XIII of the indictment. Count I alleged that Mr. Harris, without lawful justification, intentionally or knowingly shot and

killed Mr. Howard while armed with a firearm. Count XII is identical to Count I, adding the firearm enhancement language that during the commission of the offense, Mr. Harris personally discharged a firearm that proximately caused death. Count XIII also alleged that Mr. Harris shot and killed Mr. Howard, but added the language that Mr. Harris knew that such act "created a strong probability" of killing or causing great bodily harm to Mr. Howard. Count XIII also included the firearm enhancement language Mr. Harris personally discharged a firearm that proximately caused death. The trial court here found Mr. Harris guilty on all three counts and entered the same sentence for all three counts. Because Mr. Harris can only be convicted of one murder arising out of the same physical act, his other two convictions must be vacated. *People v. Pitsonbarger*, 142 Ill. 2d 353, 377-78 (1990). The trial court's comments in finding Mr. Harris guilty and at sentencing most closely reflect the charges alleged in Count XIII, and therefore we must vacate the other two convictions. We find remand is unnecessary to correct these errors because all three of the convictions at issue were for the same offense, and Mr. Harris received identical concurrent sentences for each conviction. See *People v. Price*, 221 Ill. 2d 182, 194-95 (2006) (finding remand was unnecessary where one-act, one-crime principles required the vacation of multiple theft convictions because both the statutory penalty and the concurrent sentences imposed were identical). We therefore vacate Mr. Harris' convictions and sentences on Counts I and XII. We affirm Mr. Harris' conviction and sentence on Count XIII, and we correct the mittimus pursuant to our authority under Illinois Supreme Court Rule 615(b)(1) (eff. Jan. 1, 1967). *People v. McCray*, 273 Ill. App. 3d 396, 403 (1995).

¶ 114                           III. CONCLUSION

¶ 115    For the reasons stated, we affirm the judgment of the circuit court of Cook County, vacate two of Mr. Harris' convictions for first degree murder, and, pursuant to our authority under Supreme Court Rule 615(b)(1), correct the mittimus.

¶ 116    Affirmed in part and vacated in part; mittimus corrected.